Steven PAENITZ, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 89-SC-937-MR.

Supreme Court of Kentucky.

June 6, 1991.

Elizabeth A. Hill, Fayette County Legal Aid, Lexington, for appellant.

Frederic J. Cowan, Atty. Gen., Perry T. Ryan, Asst. Atty. Gen., Frankfort, for appellee.

SPAIN, Justice.

Appellant was convicted of the first-degree rape of a three-and-one-half-month-old girl and sentenced to eighty years' imprisonment. He appeals as a matter of right.

After being evicted from his apartment, appellant moved in with acquaintances William and Mary Bogumil. They had two children, a boy eighteen months old and a girl three and one-half months old. Two weeks later, on December 10, 1988, the Bogumils went to a nearby laundromat. Because the baby girl was asleep and because William planned to return in five minutes, the baby was left at home with the appellant.

William returned in approximately fifteen minutes. He found the appellant crouched over the baby on the couch and blood all around. The baby had suffered a tearing between her vagina and rectum, and blood was still oozing from the wound when the baby thereafter was seen at the hospital. Subsequently, appellant was charged with first-degree rape.

Appellant's defense was that the tearing must have occurred because he inserted his finger in the baby's vagina while he was masturbating. Appellant testified that he suffers from the condition of pedophilia, wherein an adult has a sexual fascination for children. While his testimony indicated that he had been involved in problems with children before, he stated that he had not previously engaged in sexual acts with a victim so young as this one. Appellant further noted that he turned himself in some two days after this crime because he believed it was time to stop running.

■ Appellant argues that the evidence was insufficient to prove the insertion of his penis into this baby and, therefore, he should have been entitled to a directed verdict on the first-degree rape charge. On the contrary, it appears that the circumstantial evidence was sufficient to submit this matter to the jury. Pubic hairs were found in the baby's vaginal area which were consistent with the pubic hairs taken from appellant. Furthermore, there were lice found in appellant's pubic hairs and

there were empty lice eggs found in the pubic hairs taken from the vaginal area of the baby. The examining doctor's testimony indicated that the tear in the baby could have been caused by a penis, although it also could have been caused by any blunt object. The case necessarily depends on circumstantial evidence; however, the evidence here was sufficient to submit to the jury the question of whether there was penile penetration.

An infinitely more troublesome issue involves the failure of Karen Carter, a juror who sat on this case, to disclose during voir dire a pretrial conversation she had about the case with Dr. Janice Porter, who testified at trial as the examining doctor. Dr. Porter called the Commonwealth's Attorney's office shortly after the trial and informed the prosecutor that she had had a discussion with this juror prior to the trial. During voir dire, this juror was given every opportunity to admit such a discussion, but failed to do so. Instead, she simply acknowledged knowing the first name of the doctor and that she knew her by way of their swimming together at the YWCA. She stated that her decision in this case would not be influenced by her minimal knowledge of the doctor. Because of this assurance, this juror was not challenged for cause nor peremptorily. Of course, there was no indication at all from this juror that she had any knowledge whatsoever about this case, nor any relationship with the doctor wherein she would have gleaned any information about this case.

As it turned out, this was false. During a hearing on a motion for a new trial, Dr. Porter testified that she had discussed the case with this juror three days prior to trial. She had informed the juror that it was an "awful" case involving the *rape* of a three-and-one-half-month-old baby. She noted that the baby was "ripped" from her vagina to her rectum, and she further noted that she would not want to be a juror in a case like this. This juror assured her that she would not be sitting on the case even though she was on the jury panel because her husband was a lawyer and because she would tell the court that she knew the doctor.

It was a flagrant abuse of juror responsibility for this juror to have failed to disclose the discussion during voir dire examination. The trial court asked if any juror had *any* knowledge or information about this case. This juror sat silent. The trial court questioned this juror with regard to her admission that she knew Dr. Porter, and the juror appears to have carefully concealed her discussion of the case with the doctor. To risk reversal of a conviction, forcing all of the parties to once again go through the ordeal of a trial of this nature, reflects a harsh insensitivity and a complete failure to observe minimum standards of juror responsibility. Such conduct also reveals a lack of basic truthfulness. To make matters even worse, Dr. Porter testified that she saw the juror at the YWCA within a couple of days after the trial, at which time the juror gave her the "thumbs up" sign and asked her, "Were you surprised to see me?" (presumably in the jury box).

Juror Carter admitted at the posttrial hearing that, during voir dire when Dr. Porter was identified as a potential witness, she recalled her earlier conversations with Dr. Porter and failed to disclose this even when she knew that it was the same case which Dr. Porter had spoken about to her.

This is a case which strikes at the very bedrock foundations of the constitutional right to a trial by an impartial jury. U.S. CONST. amends. VI, XIV; KY. CONST. section 11.

While in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) the Supreme Court of the United States recognized that even some errors alleged to be of constitutional magnitude may be found to be harmless, the Court added that "there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." *Id.* at 22–23, 87 S.Ct. at 827. It emphasized that it was not the Court's intention to treat as harmless those constitutional errors that "affect substantial rights of a party." *Id.*

Thereafter in *Gray v. Mississippi*, 481 U.S. 648, 107 S.Ct. 2045 at 2057, 95 L.Ed.2d 622 (1977), in dealing with the challenge of a juror, the court stated:

> Because the *Witherspoon [v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)] [*Wainwright v.*] *Witt* [469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)] standard is rooted in the constitutional right to an impartial jury, (citations omitted), and because the impartiality of the adjudicator goes to the very integrity of the legal system, the *Chapman* harmless-error analysis cannot apply. We have recognized that "some constitutional rights [are] so basic to a fair trial that their infraction can never be treated as harmless error." *Chapman v. California*, 386 U.S., at 23, 87 S.Ct. at 827. The right to an impartial adjudicator, be it judge or jury, is such a right.

The case at hand clearly presents such a situation. Appellant's guilt and punishment had to be adjudicated by a unanimous jury of twelve. If only one juror was not convinced beyond a reasonable doubt that there had been penile rather than only digital penetration of the baby by appellant, he could not have been convicted of rape, but only of a lesser-included offense, with the possibility of a lesser punishment. Perhaps such a juror would have been seated in place of Juror Carter had she revealed her pretrial conversation. Instead, she was seated and perhaps even served as an advocate for the prosecution, judging by her "thumbs up" sign to the Commonwealth's medical witness following the rape conviction and eighty-year sentence recommendation.

This case is one of those shocking, repulsive crimes which tempt us to find only harmless error so that we might affirm the conviction and sentence, but this would only prove the maxim that "Hard cases make bad law." Our clear duty to our revered legal system requires us instead to reverse the judgment of conviction and to remand for a new trial.

COMBS, LAMBERT, LEIBSON, REYNOLDS and WINTERSHEIMER, JJ., and W. TERRY McBRAYER, Special Justice, concur.

STEPHENS, C.J., not sitting.