Ross Brandon SLUSS, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 2011–SC–000318–MR.

Supreme Court of Kentucky.

Sept. 20, 2012.

Jerry Alan Patton, P.S.C., Prestonsburg, KY, Counsel for Appellant.

Jack Conway, Attorney General, Perry Thomas Ryan, Assistant Attorney General, Office of Attorney General, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice NOBLE.

After a jury trial, Appellant Ross Brandon Sluss was convicted of murder, assault in the first degree, two counts of assault in the fourth degree, driving under the influence of intoxicants, and tampering with physical evidence. Appellant was sentenced to life imprisonment. He raises sixteen issues on appeal. This Court concludes that the trial court erred in not giving full consideration to Appellant's claim of juror misconduct, which is founded on a question of first impression alleging that jurors may have lied during voir dire and juror bias through the use of social media websites, namely Facebook. This case is therefore remanded to the Martin Circuit Court to hold a hearing on whether the jurors answered voir dire questions truthfully, and, if not, the extent

of exposure the jurors had to the Facebook account of the victim's mother, and whether that exposure, if any, tainted the jurors to such extent that it was a miscarriage of justice to allow them to participate as jurors in Appellant's trial. Consideration of the remaining issues on appeal, except for the directed verdict question, is abated pending resolution of the juror issue.

## I. Background

On June 24, 2010, in Martin County, Kentucky, Appellant Ross Brandon Sluss crashed his Ford F–150 pickup truck into an SUV carrying several passengers, one of whom was Destiny Brewer, who died as a result of her injuries. Three other passengers were injured.

At the scene of the crash, Appellant was administered two types of field sobriety tests, which he failed. He was not immediately arrested but was given a second test by a deputy familiar with Appellant's normal mannerisms. Upon failing this test, Appellant was arrested for driving under the influence. Appellant admitted that he had smoked marijuana earlier that day, and at that point, was given his *Miranda* warnings.

Appellant subsequently refused to consent to blood or urine tests, and a search warrant to withdraw blood and for a urinalysis was obtained. Appellant later consented to the blood test. But he was resistant to the urinalysis, and provided a small amount of urine. The blood screen indicated the presence of cannabinoid metabolites (marijuana) and a number of other medications, including oxycodone,[1] alprazolam,[2] hydrocodone,[3] and meproba-

---

1. Oxycodone is the generic name of an opioid pain drug often marketed under the brand names OxyContin and Percocet.

2. Alprazolam is the generic name of a type of benzodiazepine often marketed under the brand name Xanax.

3. Hydrocodone is the generic name of another opioid pain drug. It is marketed under numerous brand names, including Lortab.

mate.[4] The urinalysis was not completed because there was insufficient urine in the sample. The toxicity report indicated that each of the substances indicated in the blood screen was at or under "therapeutic" levels.

On September 2, 2010, Appellant was indicted by the grand jury of Martin Circuit Court, charging him with murder, assault in the first degree, two counts of assault in the second degree, driving under the influence of intoxicants, tampering with physical evidence, and being a persistent felony offender in the second degree.

This case received much publicity in Martin County due to the age of Destiny Brewer, who was eleven years old, and the tragic circumstances surrounding her death. There were numerous articles in the local newspapers and reports on the television news programs. Members of the community also took to the internet to discuss the incident and the upcoming trial on websites such as Facebook and Topix. The trial court acknowledged the publicity surrounding the case and engaged in extensive voir dire procedures in order to ensure that Appellant received a fair trial, striking more than fifty potential jurors for cause.

Appellant was convicted of murder, assault in the first degree, two counts of assault in the fourth degree, operating a motor vehicle under the influence of alcohol or drugs, and tampering with physical evidence. The jury recommended a life sentence on the count of murder. The jury also recommended a twenty-year sentence on the count of assault in the first degree, a 12–month sentence on the two counts of assault in the fourth degree, a six-month sentence on the driving under the influence charge, and a five-year sentence on the tampering with physical evidence charge. Limited by *Bedell v. Commonwealth*, 870 S.W.2d 779, 783 (Ky.1994) ("[N]o sentence can be ordered to run consecutively with such a life sentence in any case . . . ."), the trial court sentenced Appellant to life in prison. He now appeals to this Court as a matter of right. Ky. Const. § 110(2)(b).

## II. Analysis

Appellant raises sixteen issues in his appeal. At this time, the Court need only address two of the Appellant's issues. The Court must resolve the directed verdict claim because it could effectively result in an acquittal and thus render moot many if not all of the other issues. Concluding that a directed verdict was not appropriate, this Court must then turn to the other issues. Given this Court's resolution of the claim regarding juror misconduct, however, only that additional issue needs to be addressed at this time.

### A. Appellant was not entitled to a directed verdict.

 Appellant claims that the trial court's denial of his motion for a directed verdict was reversible error. This Court chooses to address this issue first because it is potentially dispositive; if the trial court did commit reversible error, Appellant's convictions would be vacated and he would stand acquitted, at least of the highest level of offense. *See, e.g., Paulley v. Commonwealth*, 323 S.W.3d 715, 722 (Ky. 2010) (addressing directed verdict claims even after reversing for other reasons because the claims were "potentially dispositive").

Appellant contends that the Commonwealth did not prove the necessary elements of wanton murder under KRS 507.020(b), which states:

---

4. Meprobamate is a tranquilizer.

A person is guilty of murder when ... [i]ncluding, but not limited to, the operation of a motor vehicle under circumstances manifesting extreme indifference to human life, he wantonly engages in conduct which creates a grave risk of death to another person and thereby causes the death of another person.

Appellant's argument is that the Commonwealth could not prove that he operated his vehicle "under circumstances manifesting extreme indifference to human life," and therefore the highest crime for which he could be charged was manslaughter in the second degree under KRS 507.040.[5] In *Brown v. Commonwealth*, 975 S.W.2d 922 (Ky.1998), the Court held that the "culpable mental state defined in KRS 507.020 as 'wantonness,' ... without more, will suffice for a conviction of manslaughter in the second degree but not for murder because, to qualify as murder, ... it must be accompanied by further circumstances manifesting extreme indifference to human life." *Id.* at 923 (quoting *McGinnis v. Commonwealth*, 875 S.W.2d 518, 520 (Ky.1994)) (some quotation marks omitted).

This Court has made clear that intoxication, along with other factors, can suffice to prove the wanton murder element of "circumstances manifesting extreme indifference to human life." *See Hamilton v. Commonwealth*, 560 S.W.2d 539 (Ky.1977). In *Hamilton*, a truck driver was driving under the influence of alcohol, was speeding, and ran a stop light, colliding with a car being driven into an intersection. The Court determined that the facts were sufficient for the jury to find the defendant guilty of wanton murder and ruled as follows:

The facts in this case demonstrate that the accident was not the typical automobile accident where a driver makes a gross error of judgment and is tried for manslaughter or reckless homicide. Rather, Hamilton's conduct surpasses the usual vehicle manslaughter case and demonstrates "wanton" conduct and extreme indifference to human life. The jury was instructed on murder, second degree manslaughter and reckless homicide. It found that Hamilton should have known of the plain and obvious likelihood that death or great bodily injury could have resulted from operating his truck, while in a drunken condition, through an intersection where a red light demanded that he stop.

*Id.* at 543. Since *Hamilton*, multiple cases have acknowledged that a defendant may be convicted of wanton murder so long as there is sufficient evidence under which a jury may conclude that a defendant drove his vehicle under circumstances manifesting an extreme indifference to human life. *See Cook v. Commonwealth*, 129 S.W.3d 351, 362–63 (Ky.2004); *Love v. Commonwealth*, 55 S.W.3d 816, 827 (Ky.2001); *Estep v. Commonwealth*, 957 S.W.2d 191, 192 (Ky.1997).

While Appellant concedes that a wanton murder jury instruction is appropriate in some circumstances, he argues that the facts of this case do not demonstrate that he operated his vehicle under circumstances manifesting an extreme indifference to human life. Appellant's principal argument is that there was no proof that he was intoxicated at the time of the crash. He relies on testimony from his own expert that, because each of the substances indicated in Appellant's blood screen was at or below "therapeutic levels," he could

---

5. KRS 507.040(1)(a) states: "A person is guilty of manslaughter in the second degree when he wantonly causes the death of another person, including, but not limited to, situations where the death results from the person's ... [o]peration of a motor vehicle...."

not have been intoxicated at the time of the crash. Appellant does not, however, acknowledge that even therapeutic doses of certain prescription medications may sufficiently impair someone driving a vehicle. Most prescription medications warn against that precise conduct on the pill bottle. Moreover, evidence was presented during trial that Appellant's doctor had specifically warned him about driving on such medications a few days prior to the crash. Finally, Appellant fails to address the fact that, although each individual substance in his blood screen was at or below therapeutic levels, the combination of four medications (two painkillers, an anti-anxiety medication, and a tranquilizer) would almost certainly cause increased impairment.

Appellant also argues that in *Hamilton,* the defendant had been operating his motor vehicle at a high rate of speed at the time of the accident. He notes that the cases applying *Hamilton* included similar aggravating facts beyond the fact of intoxication. Here, Appellant was not operating his vehicle above the speed limit at the time of the crash according to data collected from a computer in his truck that was analyzed after the accident. However, Appellant is incorrect that previous cases have created a "checklist" of factors a court must examine when determining whether a wanton murder jury instruction should be given to a jury. While it is certainly true that speeding is a factor that courts have considered, *Hamilton* makes clear that the trial court and the jury must examine the specific facts of each case and make a determination based on the "totality of the circumstances."

In this case, there was evidence that Appellant was under the influence of four prescription medications as the time of the crash, that Appellant admitted to using marijuana earlier that day, and that the prescribing doctor had warned Appellant a few days before about operating a motor vehicle after taking the medication. There was eyewitness testimony that prior to the crash Appellant crossed over double yellow lines to pass another vehicle, that Appellant was swerving in and out of his lane, and that he swerved all the way over to the outside white line in the opposite lane. All of this behavior occurred as Appellant was approaching a curve in the road from which other vehicles, including the one carrying Destiny Brewer, were coming. Despite the fact that he was not speeding, the totality of the facts would allow a reasonable jury to conclude that Appellant was operating his motor vehicle under circumstances manifesting an extreme indifference to human life.

■ While there is conflicting evidence about Appellant's level of impairment and there is evidence that Appellant was not speeding, we cannot say that the trial court committed reversible error by denying the motion for a directed verdict. On appeal, the test of a directed verdict is "if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky.1991) (citing *Commonwealth v. Sawhill,* 660 S.W.2d 3 (Ky.1983)). Because it would not be unreasonable for a jury, given the evidence presented by the Commonwealth, to find Appellant guilty of wanton murder, the trial court did not err in denying a directed verdict.

**B. Appellant is entitled to an additional hearing to investigate potential juror misconduct.**

Appellant claims that the trial court erred in denying his motion for a new

trial[6] based on juror misconduct by showing that two jurors may have been "Facebook friends" with the mother of the victim. Evidence was presented after trial suggesting that the jurors, Virginia Matthews and Amy Sparkman–Haney, were "friends" with April Brewer, mother of the victim, on the social media website Facebook during the Appellant's trial, despite their indication during voir dire that they did not know the victim or her family, or the circumstances of the Appellant's case. Virginia Matthews also stated in voir dire that she did not use Facebook. In support of his motion, Appellant provided the trial court with "screenshots" (electronically captured images from a computer screen) showing that persons named "Virginia Matthews" and "Amy Sparkman Haney" were "friends" with an April Brewer. Appellant also provided screenshots of part of the mother's Facebook page, which contained information about the death of her child.

The publicity of this case was a central concern for the trial court at the beginning of this trial. In addition to newspaper and television stories discussing the case, the record indicates that members of the community had often discussed the case on Facebook and Topix, an online message board popular in small communities and known as a hotbed of gossip. For these reasons, the trial court conducted individual voir dire about the publicity surrounding the case in addition to the usual general voir dire.

During general voir dire, the jurors were asked if they knew the victim or any of the victim's family. Neither Ms. Matthews nor Ms. Sparkman–Haney spoke up when asked this question. After the general voir dire, the judge conducted the individual voir dire about the publicity surrounding the case.

The trial judge typically began individual voir dire by asking the jurors if they were on Facebook or Topix. If they indicated that they were on those sites, the trial judge inquired about whether they had seen anything on Facebook or Topix discussing the case. A few of the jurors mentioned that they had seen messages about changing the law or that a fund had been set up for the victim's family. More than fifty jurors were struck for cause during voir dire, often for indicating that they had knowledge of the case via newspaper, television, or social media. None of the jurors were asked directly whether they were "Facebook friends" with April Brewer, though during general voir dire they had been asked whether they knew either the victim or the victim's family.

During her individual voir dire, Amy Sparkman–Haney was asked if she knew anything about the case. She responded that she only knew that it happened. She also admitted that she had a Facebook account and that she had seen on Facebook that "something" had been set up in the victim's name for the family. She was never asked whether she was April Brewer's "Facebook friend" and did not provide that information. Ms. Sparkman–Haney sat on the jury that ultimately rendered the verdict and was actually the jury foreperson.

---

6. Appellant's motion for a new trial was framed as being based on newly discovered evidence, but the substance of his motion was on the grounds of juror misconduct. Juror misconduct would be "newly discovered" after trial because such evidence would be presented during trial if the Appellant knew of it then. RCr 10.02 allows a judge to " 'grant a new trial *for any cause* which prevented the defendant from having a fair trial,' " even when that "cause would not appear from the record of the trial." *Jackson v. Commonwealth*, 445 S.W.2d 835, 838 (Ky.1969) (quoting RCr 10.02) (emphasis added).

Virginia Matthews also denied that she had heard anything about the case during individual voir dire. When specifically asked by the trial judge whether she was "on Facebook or Topix," she paused and then responded unequivocally that she was not. Ms. Matthews also sat on the jury that convicted Appellant.

Appellant asserts that the mere fact that each juror was a "Facebook friend" with April Brewer creates a presumption of juror bias and should have been disclosed during voir dire. Websites such as Facebook do require a member to affirmatively approve or deny requests to enter into a "friendship."[7] Therefore, in order for the jurors to become "friends" with April Brewer, either April Brewer would have been required to approve friendship requests from the jurors, or the jurors would have been required to approve requests from April Brewer. In either situation, the "friendship" that the jurors had with April was not happenstance; there was an affirmative act to connect the parties.

But "friendships" on Facebook and other similar social networking websites do not necessarily carry the same weight as true friendships or relationships in the community, which are generally the concern during voir dire. The degree of relationship between Facebook "friends" varies greatly, from passing acquaintanceships and distant relatives to close friends and family. The mere status of being a "friend" on Facebook does not reflect this nuance and fails to reveal where in the spectrum of acquaintanceship the relationship actually falls. Facebook allows only one binary choice between two individuals where they either are "friends" or are not "friends," with no status in between.

Indeed, some people have thousands of Facebook "friends," as was the case with April Brewer, which suggests that many of those relationships are at most passing acquaintanceships. This is further complicated by the fact that a person can become "friends" with people to whom the person has no actual connection, such as celebrities and politicians. *See, e.g.,* Robbie Woliver, *Lady Gaga and her 10 million Facebook friends: celebrity worship syndrome,* Psychology Today (July 3, 2010), http://www.psychologytoday.com/blog/alphabet-kids/201007/lady–gaga–and–her–10–million–facebook–friends–celebrity–worship–syndrome (noting that the singer Lady Gaga has "10 million Facebook friends [who] aren't really her friends").[8]

---

**7.** On its website, Facebook provides a step-by-step description of the process of adding "friends":

> Search for your friend's timeline [Facebook page] using the searchbar at the top of any Facebook page. Find the person you know and click on the Add Friend button to the right of their name. A friend request will be sent to that person. Once they confirm that they are actually friends with you, they will show up on your list of Facebook friends.... Friend connections on Facebook must be confirmed by both people involved. This means that one person has to send a request or an invitation to join the site, and the other person has to confirm this request in order for the two people to become friends.

*Adding Friends & Friend Requests,* Facebook Help Center, http://www.facebook.com/help/friends/requests (last visited Aug. 29, 2012).

**8.** However, Facebook bills itself as "a place for connecting with friends, family, and other people you know personally," and states that "[y]ou should send friend requests to people you have a real-life connection to, like your friends, family, coworkers, or classmates." *Adding Friends & Friend Requests,* Facebook Help Center, http://www.facebook.com/help/friends/requests (last visited Aug. 29, 2012). It also states: "Be sure to only send friend requests to people you know personally. We may block you from sending friend requests if requests you send go unanswered or are reported as unwelcome." *Id.* Facebook suggests instead that "[i]f you're interested in

Thus, a Facebook member may be "friends" with someone in a strictly artificial sense.

At the time Appellant discovered that jurors Matthews and Sparkman–Haney were April Brewer's "friends," Ms. Brewer had nearly two-thousand "friends" on the website. In a small community in a relatively small county such as Martin County (which has a population of about 13,000), it would not be uncommon for someone to know, to some degree, most of the people in the community, many of whom are members of Facebook, the largest social networking website on the internet with more than 900 million users worldwide. *See* Nicholas Carlson, *Facebook Q1 Profits Down, Operating Income Down,* Business Insider(Apr. 23, 2012), http://www.business insider.com/live–facebook–q1–revenues– profits–down–2012-4.

Consequently, a juror who is a "Facebook friend" with a family member of a victim, standing alone, is arguably not enough evidence to presume juror bias sufficient to require a new trial. As with every other instance where a juror knows or is acquainted with someone closely tied to a case, it is the extent of the interaction and the scope of the relationship that is the relevant inquiry.

■ In regard to jurors who admitted to being on Facebook, the trial court attempted to make this inquiry by asking whether they had read anything about the case on the website. That the court actually made this inquiry strongly suggests

that a juror's status on Facebook was not sufficient standing alone to decide whether the juror was disqualified. This is correct, because it is the closeness of the relationship and the information that a juror knows that frames whether that juror could reasonably be viewed as biased. The fact that jurors were "friends" of April Brewer, absent other evidence of a close relationship or knowledge, is not sufficient grounds for a new trial.

The Commonwealth correctly argues that the Appellant must do more than simply speculate that the relationship might have somehow affected the jury verdict. Thus, the mere fact that Amy Sparkman–Haney and Virginia Matthews were April Brewer's Facebook friends, which is the extent of the proof the trial court heard about their acquaintance, is not grounds for a new trial.

■ The problem in this case, however, is the jurors also appear to have made misstatements during voir dire. During individual voir dire, Virginia Matthews responded that she was *not* on Facebook when asked by the trial court, strongly suggesting that she was not even a member of the website. The Appellant thus had no reason to explore the extent of the Facebook interaction between juror Matthews and April Brewer because he could reasonably believe, given her statement made under oath, that juror Matthews was not a member of the website. Further, both juror Sparkman–Haney and juror Matthews did not respond during general

receiving updates from people you find interesting, but don't know personally (ex: journalists, celebrities, political figures), try subscribing to those people instead of sending them friend requests." *I know the people I've sent friend requests to, just not very well,* Facebook Help Center, http://www.facebook.com/ help/?faq=168762569893988# I-know-the-people-I'vesent-friend-requests-to,-just-not-very-well (last visited Aug. 29, 2012). "Sub-

scribing" is a way to "hear from people you're interested in, even if you're not friends." *Subscribe,* Facebook Help Center, http://www.facebook.com/help/?faq= 279614732052951 & in_context (last visited Aug. 29, 2012). This does not reflect the actual practice, however, as many celebrities, like Lady Gaga, accept millions of friend requests from people with whom they have no actual connection.

voir dire to the question about knowing any of the victims or their families. The Appellant thus had no reason to explore the extent of any possible relationship between them because he could reasonably believe, given that they were under oath, that they did not know the mother.

In essence, Appellant was foreclosed from conducting proper voir dire of the jurors. The pivotal question thus becomes whether the jurors' "friends" status with April Brewer, when combined with their apparently untruthful answer to the court's question about whether they knew the victims or their family, was sufficient juror misconduct to support a new trial. The issue is further complicated for juror Matthews because of her apparently untruthful answer to the question whether she even had a Facebook account. Again, because the trial court gave this argument short shrift in addressing the post-trial motion, we do not know to what extent the victim's mother and the jurors had actually communicated, or the scope of any actual relationship they may have had. But assuming that these jurors had read substantial information about the mother's view of the crime or material that might bias them against the Appellant in some other way, or had a hidden relationship with the mother, the question is whether Appellant's reasonable reliance on the jurors' false statements regarding their not knowing the victim's mother and regarding Facebook and "friend" status relating to the victim's mother, combined with the

subsequent discovery of evidence of the falsity, opens the door for post-trial review.

■ This Court has held that "[a]s a general rule, anything which is good cause for challenge for disqualification of a prospective juror is deemed good cause for a new trial if not known or discoverable to the defendant or his counsel before the verdict and they were misled by a false answer on voir dire." *Combs v. Commonwealth*, 356 S.W.2d 761, 764 (Ky.1962).[9] "Basically, the consideration is whether the rights of the accused have probably been prejudiced by concealed impartiality [*sic*]." *Id.* It was arguably reasonable here for Appellant, in the course of the trial, to rely on the juror's sworn statement about her use of Facebook, and on later discovering the apparent deception, to bring the matter before the trial court.

■ Nevertheless, "[i]t is incumbent upon the party claiming bias or partiality to prove the point." *Polk*, 574 S.W.2d at 337. "[T]he question still is whether bias exists as a matter of fact, and that it is not to be presumed." *Watson v. Commonwealth*, 433 S.W.2d 884, 887 (Ky.1968). In other words, an appellant cannot simply speculate that the juror in question could have been biased against him. Thus, for example, we have held that an "ambiguously worded affidavit suggesting that the juror may have had knowledge he did not reveal during voir dire" was insufficient to

---

9. This has long been the rule in this Commonwealth. *See Johnson v. Commonwealth*, 311 Ky. 182, 186, 223 S.W.2d 741, 743 (1949) ("This statute [now-repealed KRS 29.020(2)] makes it necessary for a party to inform himself as to the qualifications of jurors before the jury is sworn in order that he may exercise his right of challenge, general or peremptory, but the statute does not apply where he has been misled by a false answer of the juror on the latter's voir dire, and he has thus been

deprived of his right of challenge."); *Polk v. Commonwealth*, 574 S.W.2d 335, 336–37 (Ky. App.1978) ("When bias is apparent or known before trial, and a juror is permitted to remain, the objection to the juror is waived. When such facts are not known and would not reasonably have been determined prior to the selection of the jury, no waiver is involved, and an objection may be raised upon discovery of the bias.").

require reversal. *Gordon v. Commonwealth*, 916 S.W.2d 176, 179 (Ky.1995). This is because "[i]n circumstances where no challenge is made to juror qualification prior to or during trial and the challenge first occurs after rendition of a verdict, a party seeking relief from the effect of the verdict bears a heavy burden." *Id.* And, as a result, "[i]t is incumbent upon such a party to allege facts, which if proven to be true, are sufficient to undermine the integrity of the verdict." *Id.*

Unlike in *Gordon*, the Appellant in this case has shown that the juror gave a false answer, or at least has placed in the record sufficient evidence of the answer's falsity to require further inquiry (such as to confirm that the Facebook account actually belonged to the juror), which the trial court in this case showed no interest in pursuing. Yet this Court has repeatedly held that false answers given by jurors during voir dire, even when that fact is not discovered until after trial, raise substantial constitutional issues.

In *Paenitz v. Commonwealth*, 820 S.W.2d 480 (Ky.1991), a juror was acquainted with one of the prosecution's expert witnesses in a rape prosecution. Before the trial began, the juror spoke with the . expert witness about the crime and was given extensive details about the case in response. Yet, when the juror was examined in voir dire and specifically asked if she had any knowledge about the case, the juror stated only that she was casually acquainted with the expert witness and that her "minimal knowledge" of the expert would not influence her. This Court described the incident as "a flagrant abuse of juror responsibility for this juror to have failed to disclose the discussion during voir dire examination." *Id.* at 481. The Court further stated that the "case ... str[uck] at the very bedrock foundations of the constitutional right to a trial by an impartial jury," and reversed the defendant's convictions. *Id.*

Similarly, in *Drury v. Franke*, 247 Ky. 758, 57 S.W.2d 969, 984 (1933), several jurors failed to disclose that they had been in car accidents, despite being asked specifically about them and despite the case being about a car accident. The Court noted: "The information which was sought to be elicited by the question addressed to the jury panel was pertinent to enable the plaintiffs to intelligently exercise their challenges, a valuable right. If the truth had been learned, they might have challenged some of these jurors peremptorily." *Id.* at 984. The Court ultimately concluded that "a litigant is entitled to a new trial because a juror gave a false answer, or no answer, to a pertinent question addressed to him on the voir dire examination." *Id.*[10]

---

10. In reaching this conclusion, the Court cited at length a set of reasons why false answers on voir dire required reversal, including that

[w]hen the statutory conditions and terms for setting up an authorized jury are not met; the right to challenge a given number of jurors without showing cause is one of the most important rights to a litigant; any system for the empaneling of a jury that prevents or embarrasses the full, unrestricted exercise of the right of challenge must be condemned; ... such rules, as aiding to secure an impartial, or avoid a partial, jury, are to be fully enforced; the voir dire is of

service not only to enable the court to pass upon a juror's qualifications, but also in assisting counsel in their decision as to peremptory challenge; the right of challenge includes the incidental right that the information elicited on the voir dire examination shall be true; the right to challenge implies its fair exercise, and, if a party is misled by erroneous information, the right of rejection is impaired; a verdict is illegal when a peremptory challenge is not exercised by reason of false information; the question is not whether an improperly established tribunal acted fairly, but it is whether a proper tribunal was established; ... the fact

Importantly, the Court noted that "the fact that the false information was unintentional, and that there was no bad faith, does not affect the question, as the harm lies in the falsity of the information, regardless of the knowledge of its falsity on the part of the informant; [and] while willful false-. hood may intensify the wrong done, it is not essential to constitute the wrong." *Id.* at 985 (paraphrasing and citing *Shulinsky v. Boston & M.R.R.*, 83 N.H. 86, 139 A. 189, 191 (1927)).

Despite the fervor with which our cases have condemned even innocent falsehoods by jurors uttered during voir dire, there is still the requirement in *Combs* and other cases that the information was not discoverable or could not reasonably have been determined prior to the selection of the jury. In his motion for a new trial, Appellant did not assert that he was unable to discover the "friendship" between the jurors and April Brewer prior to the verdict or that one of the jurors lied when she claimed not to have a Facebook account. Indeed, the case law regarding RCr 10.02 and RCr 10.06, the ostensible bases for Appellant's motion, requires that this information not be reasonably discoverable before the conclusion of the trial.

The shortcomings of Appellant's motion, however, are understandable. Whether being a person's Facebook "friend" standing alone can disqualify a juror is a question this Court has not been called upon to answer, nor has the Court previously considered the impact of an online "friendship" between a juror and someone closely involved in a criminal case. More broadly, it is the first time that the Court has been asked to address counsel's investigation of jurors by use of social media. Without precedential guidance, Appellant's failure to demonstrate in his motion for a new trial why this evidence could not be discovered prior to the verdict is excusable since there was little reason for him to think he needed to investigate a juror's Facebook account or that he even could have done so ethically given the state of the law at the time of trial. Moreover, Appellant was not on notice that such an investigation was necessary on the basis of Virginia Matthews' unequivocal denial that she was a member of Facebook, and both jurors' failure to state that they knew April Brewer.

There is further an unsettled question about the extent to which counsel for a criminal defendant may investigate jurors during or after trial.[11] The question gen-

---

that a juror disqualified either on principal cause or to the favor has served on a panel is sufficient ground for setting aside the verdict, without affirmatively showing that that fact accounts for the verdict; it is highly important that the conflicting rights of individuals should be adjudged by jurors as impartial as the lot of humanity will admit; next to securing a fair and impartial trial for parties, it is important that they should feel that they have had such a trial, and anything that tends to impair their belief in this respect must seriously diminish their confidence and that of the public generally in the ability of the state to provide impartial tribunals for dispensing justice between its subjects; ... that the injury is brought about by falsehood, regardless of its dishonesty, and the effect of the information is

misleading, rather than a purpose to give misleading information is the gist of the injury; when the fact appears that false information was given, and that it was relied upon, the right to a new trial follows as a matter of law.

*Drury v. Franke*, 247 Ky. 758, 57 S.W.2d 969, 984–85 (1933) (paraphrasing and citing *Shulinsky v. Boston & M.R.R.*, 83 N.H. 86, 139 A. 189, 191 (1927)).

11. Some cases have begun addressing whether trial courts may prevent a party from using the internet for investigating potential jurors during voir dire. *See Carino v. Muenzen*, No. L–0028–07, 2010 WL 3448071, at *10 (N.J.Super.Ct.App.Div. Aug. 20, 2010); *see also* Amy J. St. Eve & Michael A. Zuckerman, *Ensuring an Impartial Jury in the Age of So-*

erally involves whether the attorney engaged in inappropriate "communications" with a juror, such as adding the juror as a "friend" on Facebook directly through his own account or through a form of deception, or whether the information was truly public. If the information about a juror is available to the public on a social media site, ethics opinions from other jurisdictions suggest that counsel may investigate that information. *See, e.g.,* N.Y. Cnty. Lawyers Ass'n Comm. on Prof'l Ethics, Formal Op. 743 (May 18, 2011), *available at* http://www.nycla.org/siteFiles/Publications/Publications1450_0.pdf. Given many attorneys' unfamiliarity with the minutiae of social media, it is not unreasonable for an attorney to be cautious as to his conduct while investigating jurors during the trial.

In fact, there is evidence that, while the practice of conducting intensive internet vetting of potential jurors is becoming more commonplace, "lawyers are skittish about discussing the practice, in part because court rules on the subject are murky or nonexistent in most jurisdictions." Brian Grow, *Internet v. Courts: Googling for the Perfect Juror,* Reuters (Feb. 17, 2011), http://us.mobile.reuters.com/article/technologyNews/idUSTRE71G4VW 20110217.

Here, in order to discover the evidence in the present case, Appellant would have had to gain access to April Brewer's list of friends, which might or might not be private,[12] and then to access the two jurors' information to verify their identities. While much of this information is likely public, a reasonable attorney without guid-

ance may not think this investigatory tactic appropriate, and it is still such a new line of inquiry that many attorneys who themselves are not yet savvy about social media may never even have thought of such inquiry.

In 2011, the New York County Lawyers Association's Committee on Professional Ethics examined whether, under New York's professional conduct rule governing communications between a lawyer and a juror or member of the jury venire, N.Y. R. Prof'l Conduct 3.5, a lawyer is permitted, "[a]fter voir dire is completed and the trial commences, . . . [to] routinely conduct ongoing research on a juror on Twitter, Facebook and other social networking sites." N.Y. Cnty. Lawyers Ass'n Comm. on Prof'l Ethics, Formal Op. 743 (May 18, 2011). The Committee's ethics opinion, mirroring the ethics rule, differentiates between conduct that is permissible during the pretrial phase and conduct that is permissible during the evidentiary and deliberation phases. The committee concluded:

It is proper and ethical under [Rule of Professional Conduct] 3.5 for a lawyer to undertake a pretrial search of a prospective juror's social networking site, provided that there is no contact or communication with the prospective juror and the lawyer does not seek to "friend" jurors, subscribe to their Twitter accounts, send jurors tweets or otherwise contact them. During the evidentiary or deliberation phases of a trial, a lawyer may visit the publicly available Twitter, Facebook or other social networking site

---

*cial Media,* 11 Duke L. & Tech. Rev. 1, 35 n. 35 (2012).

**12.** Facebook users may opt to make all or part of their Facebook information private, or they may opt to make their information public. Depending on what privacy settings a

user has, some information may be entirely concealed, such as with whom that user is "friends." *See generally, Choose who you share with,* Facebook Help Center, http://www.facebook.com/help/privacy/sharing-choices (last visited Aug. 29, 2012).

of a juror but must not "friend" the juror, email, send tweets to the juror or otherwise communicate in any way with the juror or act in any way by which the juror becomes aware of the monitoring. Moreover, the lawyer may not make any representations or engage in deceit, directly or indirectly, in reviewing juror social networking sites.

*Id.* Moreover, the opinion sets forth the proper procedure for the lawyer to report jury misconduct if such misconduct is discovered:

> In the event the lawyer learns of juror misconduct, including deliberations that violate the court's instructions, the lawyer may not unilaterally act upon such knowledge to benefit the lawyer's client, but must promptly comply with [Rule of Professional Conduct] 3.5(d) and bring such misconduct to the attention of the court, before engaging in any further significant activity in the case.

*Id.*

■ Kentucky's SCR 3.130(3.5) is similar to New York's Rule 3.5 in that it prohibits certain communications between a lawyer and a juror, and distinguishes between conduct during the trial and after the jury has been discharged. The New York ethics opinion provides reasonable guidance for counsel by weighing the party's right to have an impartial jury against the lawyer's ethical duty not to interfere with jurors. This Court therefore adopts this model for the type of investigation an attorney may conduct before and during trial into a juror's social media account. Importantly, SCR 3.130(3.5)(c)[13] also clearly governs the circumstances when an attorney may communicate with a juror after the jury has been discharged. The same principles that apply to communications made before and during trial apply to post-trial communications as well.

Given that Appellant was effectively precluded from conducting a full voir dire due to the jurors' misleading response to questions asked by the trial court, this Court finds that Appellant could not have reasonably ferreted out the information regarding their apparent falsehood any sooner than he did. He is at least entitled to an adequate post-trial hearing to examine this issue. In many cases, proof of juror falsehoods by themselves has been enough to require reversal.[14] But in other cases, the

---

**13.** SCR 3.130(3.5)(c) states that a lawyer shall not "communicate with a juror or prospective juror after discharge of the jury if: (1) the communication is prohibited by law, local rule, or court order; (2) the juror has made known to the lawyer a desire not to communicate; or (3) the communication involves misrepresentation, coercion, duress or harassment."

**14.** It is worth noting that the rule in RCr 10.04, which states that "[a] juror cannot be examined to establish a ground for a new trial, except to establish that the verdict was made by lot," does not apply here. That rule, which was present in the old Criminal Code of Practice and was part of the common law, focuses only on what the jury did during deliberations. *See, e.g., Ne Camp v. Commonwealth,* 311 Ky. 676, 680, 225 S.W.2d 109, 112 (1949) ("It is particularly related to the discussion of the jurors during their deliberations, which are intended to be and should be private, frank and free."). Evidence of juror misconduct outside the deliberation room, however, can be the grounds for a new trial. *Id.; see also Drury v. Franke,* 247 Ky. 758, 57 S.W.2d 969, 984–85 (1933). The reason for this is quite simple:

> The court will not be blinded by too strict an interpretation of this technical rule of evidence, the reasons for which not existing in the present case. Legal technicalities ought not afford justification for ignoring the plain facts before us—facts which vitiate a verdict and judgment that will take a human life. We abhor the ancient veneration for legal form which often prostituted substantive justice and produced inhumane consequences. Such judicial practice is condemned by law of more sublime origin

effect of the falsehood could only be demonstrated by questioning the juror in court after the trial. *See, e.g., Paenitz,* 820 S.W.2d at 481.

The Appellant has not yet had an adequate opportunity to question the two suspect jurors in this case. Though the Appellant did not specifically ask to question the jurors when his motion was argued, the judge actually ruled on the motion before defense counsel had a chance to argue it, though the court then withdrew the ruling, allowed the attorney a few minutes to argue, and summarily denied the motion. However, the Appellant has included in the record sufficient evidence that one of the jurors appears to have lied explicitly (about having a Facebook account) during individual voir dire and that both jurors may have lied by omission when they failed to respond to the general voir dire question about whether they knew anyone involved in the case. Appellant has also raised significant questions about the kind of information these two jurors might have seen on the mother's Facebook page, which could create bias sufficient to require a full hearing on these issues.

Consequently, given the state of the record, this Court is not able to resolve the factual issues presented by this case. Indeed, the proper forum for those issues is the trial court. While Appellant has not yet demonstrated that his convictions were tainted by unfairness at trial so as to require reversal, he has established to this Court's satisfaction that further proceedings are required.

Having reviewed various options, it is clear that this case requires a remand for a hearing similar, in some respects, to the retrospective competency hearing process laid out in *Thompson v. Commonwealth,* 56 S.W.3d 406, 410 (Ky.2001), *overruled in part on other grounds by Padgett v. Commonwealth,* 312 S.W.3d 336 (Ky.2010).

### III. Conclusion

The trial court did not err in its ruling on the motion for directed verdict. For the reasons discussed above, however, this Court remands this case to the Martin Circuit Court for the limited purpose of conducting a hearing within 60 days from the entry of this Opinion to determine whether Virginia Matthews' and Amy Sparkman–Haney's answers during voir dire were false and whether they should have been struck for cause. The court must consider whether Virginia Matthews had a Facebook account at the time of voir dire, when she became "Facebook friends" with April Brewer, whether the "Virginia Matthews" listed in April Brewer's friends list is the same as the juror who rendered the verdict, and the extent and nature of the juror's relationship with April Brewer. As to Amy Sparkmen–Haney, the court must consider when she became "Facebook friends" with April Brewer, whether the "Amy Sparkman–Haney" listed in April Brewer's friends list is the same as the juror who rendered the verdict, and the extent and nature of the juror's relationship with April Brewer. The court may also consider any other factors it deems appropriate to determine whether Appellant was tried by a fair and impartial jury. If the trial court determines that Virginia Matthews or Amy Sparkman–Haney should have been struck for cause, it shall enter an order granting a new trial pursuant to RCr 10.02. If the trial court

---

and more awful sanction than any human code.

*Ne Camp,* 311 Ky. at 681, 225 S.W.2d at 112. While the Appellant in this case was not given the death penalty, he was given life in prison. The whole life of his liberty, while perhaps not as precious as his life itself, is nevertheless deserving of judicial protection.

does not make such a determination, then it shall make findings of fact in support of this conclusion in its order, which shall be appealable by Appellant. Consideration of the remaining issues on appeal pending the resolution of the juror misconduct hearing is abated awaiting the outcome of that hearing.

All sitting. All concur.