# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: JUNE 20, 2025
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0356-MR

KRISTOPHER SHANE WEST            APPELLANT

V.

ON APPEAL FROM OHIO CIRCUIT COURT
HONORABLE TIMOTHY R. COLEMAN, JUDGE
NO. 20-CR-00171

COMMONWEALTH OF KENTUCKY            APPELLEE

## MEMORANDUM OPINION OF THE COURT

## AFFIRMING

Kristopher Shane West appeals from his convictions by the Ohio Circuit Court following a jury trial. The jury determined West was guilty of murder, assault in the first degree, and other related offenses involving his operation of a motor vehicle while he was intoxicated.

Finding no grounds for the reversal of any of West's convictions, we affirm. However, the parties have agreed that the monetary fines and costs assessed against West were in error given his indigency and therefore these are vacated.

## I. FACTUAL AND LEGAL BACKGROUND

On the afternoon of August 27, 2020, West drove his Toyota Highlander to pick up his eighteen-year-old friend Kaela Hilliard who brought along her own friend, seventeen-year-old Brianna Bratcher. West was twenty-seven years

old and driving on a suspended license owing to three previous driving under the influence (DUI) convictions. The Toyota was not licensed nor was it insured.

West drove to a liquor store where he purchased a bottle of vodka and next the trio went to Ellis Park where they spent approximately forty-five minutes smoking marijuana. Bratcher only took "a sip" of vodka while Hilliard did not drink. After leaving the park West proceeded to "drive around" while continuing to drink the vodka he had purchased.

While driving on State Route 69, West began driving faster and began passing other cars. One vehicle West passed was driven by Alyssa Niblick. West passed Niblick on a curve where the roadway was only two lanes. She testified she was concerned that she had been passed in a no-passing zone where motorists could not see oncoming traffic and called 911 to report a reckless driver. Niblick also testified to seeing a young girl (Hilliard) in the front passenger seat who looked terrified and another young girl in the back seat (Bratcher).

Another driver, Luke Lykens, watched West speed up the center of the road and drive through an intersection passing cars by driving into the oncoming lane. According to Lykens, the Toyota was going so fast when it turned left in front of him that the vehicle appeared to start drifting and the passenger in the front seat was "plastered" up against the vehicle's window as it turned. Lykens followed West and the Toyota continued to drive towards cars in the oncoming lane. Three other vehicles in succession drove onto the shoulder as West sped towards them. Lykens testified that West was driving

2

between 90 and 100 miles per hour (mph) and swerved to the right into a ditch and then back across the roadway into the opposite ditch. At that point, Lykens pulled to the side of the road and called 911.

Daniel Bellamy was one of the motorists who had to swerve to avoid West on Highway 231 when West swerved into Bellamy's lane. Bellamy was driving his ambulance along with his coworker Melinda Hall. A few minutes later they would get the call to respond to a single vehicle wreck where Bellamy recognized the Toyota that had almost hit him head-on.

West's Toyota ultimately left the roadway striking a telephone pole on the rear passenger side and then flipped and rolled two times before coming to rest in a brush pile. The posted speed limit at the site of the wreck was thirty-five miles per hour. Sergeant Chris Rafferty of the Kentucky State Police analyzed the event data recorder (EDR) of the Toyota and testified that it was travelling at 54.7 miles per hour 4.4 seconds before the collision and its brakes were not applied.

West, Hilliard, and Bratcher were all ejected from the Toyota. West and Hilliard were ejected through the side windows, and Bratcher was ejected through the sunroof. Bratcher died at the scene from multiple blunt force trauma. Hilliard was transported by ambulance to Owensboro Regional Hospital with an L1 superior endplate fracture which is a compression fracture of lumbar vertebrae. West sustained a concussion.

West had a blood alcohol level of 0.149. West's blood tests also revealed THC from his marijuana usage as well as the presence of methamphetamine

3

and amphetamines. Dr. Greg Davis of the University of Kentucky College of Medicine testified that West was intoxicated by, and otherwise impaired by, alcohol, marijuana, and methamphetamine/amphetamine at the time of the collision.

West testified at his trial and admitted he had been drinking vodka and smoking marijuana on the day of the accident and that he had methamphetamine in his system. He also did not deny that his Toyota had expired registration plates and admitted he had no valid driver's license or insurance.

At the conclusion of his four-day trial, West was convicted of murder (Bratcher's death), assault in the first degree (Hilliard's injuries), operating a motor vehicle under the influence-fourth offense, unlawful transaction with a minor in the second degree (Bratcher), possession of an open alcohol container in motor vehicle, possession of drug paraphernalia, operating on a DUI suspended license-second offense-aggravating circumstances, failing to maintain required insurance, and having no registration plates. Following the recommendation of the jury, the trial court sentenced West to a total of fifty-six years' imprisonment for these convictions.

## II.  ISSUES

West argues the trial court erred by: (1) denying his motion for a directed verdict as to first-degree assault; (2) denying his motion for a directed verdict as to murder; and (3) assessing fines, fees, and costs against him given his indigency.

4

### A. Sufficient evidence of serious physical injury was presented to support West's conviction for first-degree assault.

West's counsel moved for a directed verdict on the charge of first-degree assault at the close of the Commonwealth's case and again at the close of the defense's case. In considering whether a motion for directed verdict should be granted, "[t]he trial court must draw all fair and reasonable inferences from the evidence in favor of the party opposing the motion, and a directed verdict should not be given unless the evidence is insufficient to sustain a conviction." *Commonwealth v. Sawhill*, 660 S.W.2d 3, 5 (Ky. 1983).

As stated in *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991):

> If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

On appeal, the denial of a directed verdict motion is reviewed to determine whether "under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then is the defendant is entitled to a directed verdict of acquittal." *Lamb v. Commonwealth*, 510 S.W.3d 316, 325 (Ky. 2017) (quoting *Benham*, 816 S.W.2d at 187).

West argues that Hilliard did not suffer a "serious physical injury" and therefore he could not be convicted of assault in the first degree. Kentucky Revised Statutes (KRS) 508.010 states:

(1) A person is guilty of assault in the first degree when:

(a) He intentionally causes serious physical injury to another person by means of a deadly weapon or a dangerous instrument; or

(b) Under circumstances manifesting extreme indifference to the value of human life he wantonly engages in conduct which creates a grave risk of death to another and thereby *causes serious physical injury* to another person.

(2) Assault in the first degree is a Class B felony.

(Emphasis added).

A "serious physical injury" is statutorily defined in relevant part as a "physical injury which creates a substantial risk of death, or which causes serious and prolonged disfigurement, prolonged impairment of health, [or] prolonged loss or impairment of the function of any bodily organ . . . ." KRS 500.080(19).[1] According to West, while Hilliard did suffer an injury by fracturing her vertebrae, she did not require surgery, refused pain medications, only wore a brace for approximately six months, and, according to her treating physicians, was not disfigured and was expected to "make a complete and full recovery." As such, West argues that Hilliard's injuries never posed a "substantial risk of death" nor did they meet any of the other categories of injury described in KRS 500.080(19).

---

[1] The General Assembly has repeatedly amended the definitional statute of KRS 500.080 to define additional terms, leading to the renumbering of existing terms. The definition of "serious physical injury" itself has also been amended and expanded. At the time the crime occurred, the definition for "serious physical injury" was contained in KRS 500.080(15), as amended by 2017 Kentucky Laws Ch. 171 (HB 524) § 4. Currently, pursuant to 2024 Kentucky Laws Ch. 174 (HB 5) § 44, the definition for "serious physical injury now appears at KRS 500.080(19). At all times, the definitional language cited in this opinion has remained the same. To avoid confusion, we refer the definition by its current subpart.

In support of this argument, West cites to *Luttrell v. Commonwealth*, 554 S.W.2d 75 (Ky.1977), wherein this Court, in a four to three decision, held that the victim, as a matter of law, was not seriously injured. West's brief is in error, however, in its assertion that in that case "an officer was shot with buckshot." In fact, as the opinion clearly states, the officer was shot in the chest with relatively few tiny pellets, described as "bird shot," that had come from a single .38 caliber cartridge fired from a revolver. Moreover, although the officer was hospitalized for five days, his wounds were described in the opinion as merely "superficial." *Id.* at 77.

Similar reliance is placed by West on the holding in *Souder v. Commonwealth*, 719 S.W.2d 730 (Ky.1986), overruled on other grounds by *B.B. v. Commonwealth*, 226 S.W.3d 41 (Ky. 2007) where we also held that there was no evidence to prove an essential element of first-degree assault; namely, "serious physical injury." Again, we can readily distinguish that situation from the facts in the case at hand. In *Souder* we said,

> The only argument made by the Commonwealth to support "serious physical injury" is that because the child sustained burns in and about the mouth [from a cigarette or cigarette lighter], which, standing alone, admittedly were not serious, that the child may have been exposed to smoke fumes which "create[d] a substantial risk of death." . . . Without in any way depreciating the hideous nature of such an act, the fact remains that there was nothing to prove that this child was in danger of death from this injury or from any other injury inflicted upon her.

*Id.* at 732.

There is a dramatic contrast between the injuries discussed in *Luttrell* and *Souder* and those inflicted on Hilliard. In this case, the evidence included

Dr. Raque's testimony that Hilliard's fracture injury caused extreme pain, would limit her mobility, and require her to wear a back brace until the fracture healed. Also, while "medical testimony may be the preferred method of proving the serious physical injury requirement," *Brooks v. Commonwealth,* 114 S.W.3d 818, 824 (Ky. 2003), "the victim was competent to testify about [her] own injuries." *Commonwealth v. Hocker,* 865 S.W.2d 323, 325 (Ky. 1993). Here, in addition to the medical testimony, Hilliard's testimony provided important information about the extent of her injuries. She testified she wore the back brace for six months, and thus her ability to function was limited throughout that period of time. She also testified she "lost some function in [her] right arm that [she] never regained," cannot sit still for long periods of time, cannot bend over to lift things, and could not sleep, regardless of position, because she wakes up in pain.

Such testimony supports a finding of "prolonged impairment of health [or] prolonged loss or impairment of the function of any bodily organ[.]" KRS 500.080(19). Furthermore, this Court has previously determined that pain, like that suffered by Hilliard, is an "impairment of health" and prolonged pain is a "serious physical injury." *Parson v. Commonwealth*, 144 S.W.3d 775, 787 (Ky. 2004), *implied overruling on other grounds recognized by Shields v. Commonwealth*, 647 S.W.3d 144, 158 (Ky. 2022). In *Parson*, the victim was "diagnosed with multiple contusions and strains, a laceration of the elbow which was sutured, and a cervical strain." *Id.* at 786. The victim went to physical therapy and pain management, which she was still attending at the

8

time of trial and "still suffered from neck pain, although the numbness in her arms had improved and her headaches had dramatically improved." *Id.* This Court found that such evidence was sufficient to convince a jury that she suffered a prolonged impairment of health that constituted a serious physical injury. *Id.* at 787.

Trial courts should grant a motion for directed verdict "if the prosecution produces no more than a mere scintilla of evidence." *Benham,* 816 S.W.2d at 188. Additionally, "an appellate court should not reverse unless it would be clearly unreasonable for a jury to find guilt." *Commonwealth v. Goss,* 428 S.W.3d 619, 625-26 (Ky. 2014). The evidence presented at trial was more than sufficient to allow a reasonable juror to determine that Hilliard suffered a serious physical injury and to sustain a conviction of first-degree assault. As such, West was not entitled to a directed verdict and there was no error.

**B. Sufficient evidence was presented to support West's conviction for murder.**

West's counsel moved for a directed verdict on his murder charge at both the close of the Commonwealth's case and again at the close of the defense's case. West was charged with murder in accordance with KRS 507.020(1)(b) which criminalizes "the operation of a motor vehicle under circumstances manifesting extreme indifference to human life [when one] wantonly engages in conduct which creates a grave risk of death to another person and thereby causes the death of another person."

"Wantonly" is defined by KRS 501.020(3) as:

9

> A person acts wantonly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such a nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

This Court has held that a conviction of wanton murder is generally "reserved exclusively for offenders who manifest virtually no concern for the value of human life." *Johnson v. Commonwealth,* 885 S.W.2d 951, 952 (Ky. 1994).

West argues that the Commonwealth did not provide sufficient evidence for the jury to find that West acted wantonly "under circumstances manifesting extreme indifference to human life" and more was required than just his admitted impairment to find his actions to have been wanton. While West acknowledges he was "driving above the speed limit," he argues his actions could not be wanton because his speed was "not excessive" at the moment his Toyota struck the telephone pole as it was traveling only "seven mph over the speed limit" which "is reasonable and not excessive." The Toyota's EDR showed that 4.4 seconds prior to the crash, West's vehicle was traveling at 54.7 mph in a 35 mph zone; this was almost 20 mph over the speed limit. At the moment of the crash, the vehicle was traveling 42.3 mph.[2]

In *Sluss v. Commonwealth,* 381 S.W.3d 215, 220 (Ky. 2012), we stated:

---

[2] The decrease in the speed of the vehicle could be attributed to loss of velocity caused by the friction generated by the skidding/turning of the vehicle immediately prior to impact when West lost control.

> Appellant is incorrect that previous cases have created a "checklist" of factors a court must examine when determining whether a wanton murder jury instruction should be given to a jury. While it is certainly true that speeding is *a factor* that courts have considered, *Hamilton* [v. Commonwealth, 560 S.W.2d 539 (Ky.1977)] makes clear that the trial court and the jury must examine the specific facts of each case and make a determination based on *the totality of the circumstances.*

(Emphasis added).

Looking at the totality of the circumstances, West admitted he was intoxicated prior to picking up Hilliard and Bratcher and admitted to having methamphetamine in his system. He knew he should not have been driving. Despite this, he made the decision to buy and drink vodka and smoke marijuana after picking up his passengers. In addition, abundant witnesses came forward to testify to the extended period of time in which West was speeding, recklessly passing motorists on two-lane roads, driving other motorists off the road, at one point hitting a guardrail, and driving into ditches. Notably, Hilliard testified she and Bratcher were terrified and "begged" West to slow down and let them out of the vehicle.

West was indeed speeding at the time of the wreck, and he made conscious and clear choices to not only drive while he was impaired, but to substantially increase his level of impairment over the course of his travels that day, and to refuse his passengers' requests that he slow down and let them out. Those choices, together with the fact that the wholly reckless driving he exhibited was not isolated to a single moment or limited period of time, gave the trial court all the proof required to properly deny West's motions for a directed verdict. The evidence presented at trial was wholly sufficient to allow

11

reasonable jurors to determine that West was guilty of wanton murder. There was no error.

## C. Did the trial court improperly assess fines and costs?

Lastly, West argues that the trial court erred when it assessed fines totaling $1,300.00, $165.00 in court costs, and a service fee of $425.00. $300.00 of the fines were related to West's violations while the remainder of the assessments related to West's DUI 4th offense.

West argues that fines cannot be assessed against an "indigent" defendant such as himself,[3] and costs may not be imposed upon "poor persons."[4]  The Commonwealth acknowledged that West was "determined to be indigent from the beginning of his court proceedings and was appointed a public defender" and stated that "the trial court, after reviewing West's request [to appeal *in forma pauperis*] and financial statement, entered an order finding that West was a 'poor person' at the time of his sentencing." Accordingly, the Commonwealth agreed with West's position and wrote "[t]he portion of West's judgments assessing fines and costs should be vacated."

Following the Commonwealth's briefing on this issue, this Court published its decision in *Jeffreys v. Commonwealth,* 706 S.W.3d 51 (Ky. 2024), which addressed the imposition of fines and costs and the standards by which they may be avoided by those found to be indigent or poor. In *Jeffreys* we explained that a trial court's determination that a defendant's lack of resources

---

[3] *Howard v. Commonwealth,* 496 S.W.3d 471, 479 (Ky. 2016); KRS 534.030(4).

[4] *Spicer v. Commonwealth,* 442 S.W.3d 26, 35 (Ky. 2014); KRS 453.190.

12

entitling the defendant to be provided counsel does *not* equate to a finding that the person is impoverished such that they should not have fines or costs imposed upon them as part of their sentence. The trial court's determinations that West was a poor person under KRS 453.190(2)[5] only regarded "costs" that were "necessary to allow indigent persons access to the courts." *Jones v. Commonwealth*, 636 S.W.3d 503, 507 (Ky. 2021).

We make these observations to ensure that our opinion today does not indicate any departure on our part from *Jeffreys* or any implied encouragement by this Court to the Commonwealth to simply waive fines, costs or fees for defendants if they have previously been found to be entitled to court-appointed counsel. It is only due to the Commonwealth's specific agreement with West's position here, and the fact that the Commonwealth has not sought to amend its position following the rendition of *Jeffreys*, that we will not unilaterally plumb the depths of the record to conduct an independent analysis and will oblige the parties and vacate those portions of the trial court's judgment assessing fines and costs.

### III. CONCLUSION

We affirm West's conviction and sentences imposed by the Ohio Circuit Court with the exception that the fines totaling $1,300.00, the court costs of

---

[5] "A 'poor person' means a person who has an income at or below one hundred percent (100%) on the sliding scale of indigency established by the Supreme Court of Kentucky by rule or is unable to pay *the costs and fees of the proceeding* in which he is involved without depriving himself or his dependents of the necessities of life, including food, shelter, or clothing." (Emphasis added).

$165.00, and the service fee of $425.00 imposed within the trial court's Formal Sentencing Order of August 2, 2023, are hereby vacated.

All sitting.  All concur.

COUNSEL FOR APPELLANT:

Kayley Barnes
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Russell Coleman
Attorney General of Kentucky

Stephanie L. McKeehan
Assistant Attorney General