# Supreme Court of Florida

_____

No. SC17-1848
_____

**LAW OFFICES OF HERSSEIN AND HERSSEIN, P.A., etc., et al.,**
Petitioners,

vs.

**UNITED SERVICES AUTOMOBILE ASSOCIATION,**
Respondent.

November 15, 2018

CANADY, C.J.

In this case, we consider an issue regarding the legal sufficiency of a motion to disqualify a trial court judge on the basis of a Facebook "friendship." This Court granted jurisdiction to review the decision of the Third District Court of Appeal in *Law Offices of Herssein & Herssein, P.A. v. United Services Automobile Ass'n*, 229 So. 3d 408 (Fla. 3d DCA 2017), which held that the existence of a Facebook "friendship" was not a sufficient basis for disqualification and which expressly and directly conflicts with the decision of the Fourth District Court of Appeal in *Domville v. State*, 103 So. 3d 184 (Fla. 4th DCA 2012). We have jurisdiction. *See* art. V, § 3(b)(3), Fla. Const.

We hold that an allegation that a trial judge is a Facebook "friend" with an attorney appearing before the judge, standing alone, does not constitute a legally sufficient basis for disqualification. We therefore approve the decision of the Third District in *Herssein* and disapprove the decision of the Fourth District in *Domville* on the conflict issue.[1]

## BACKGROUND

In the case on review, the Law Offices of Herssein and Herssein, P.A., and attorney Reuven Herssein "filed a motion to disqualify the trial judge." *Herssein*, 229 So. 3d at 409. After the trial judge denied the disqualification motion as legally insufficient, the Herssein Firm and attorney Herssein "petition[ed the Third District] for a writ of prohibition to disqualify the trial court judge." *Id.* On review of the petition, the Third District explained the basis for the motion to disqualify that is relevant here:

> The motion [to disqualify] is based in part on the fact that [Israel] Reyes[—an attorney appearing before the trial judge on behalf of a potential witness and potential party in the pending litigation—]is listed as a "friend" on the trial judge's personal Facebook page. In support of the motion, Iris J. Herssein and Reuven Herssein, president and vice president of the Herssein Firm, signed affidavits in which they swore, "[b]ecause [the trial judge] is Facebook friends with Reyes, [the executive's] personal attorney, I have a well-grounded fear of not receiving a fair and impartial trial. Further, based on [the

_____

1. The Petitioners have presented certain other issues that we decline to address.

- 2 -

trial judge] being Facebook friends with Reyes, I . . . believe that Reyes, [the executive's] lawyer has influenced [the trial judge]."

*Id.* (some alterations in original).

The Third District expressly acknowledged that "Petitioners raise[d] three grounds" for disqualification on review. *Id.* But the Third District "wr[ote] only to address the petitioners' argument that the trial court judge should be disqualified because the judge is a Facebook 'friend' with a lawyer representing a potential witness and potential party in the pending litigation." *Id.* The Third District framed the issue as "whether a reasonably prudent person would fear that he or she could not get a fair and impartial trial because the judge is a Facebook friend with a lawyer who represents a potential witness and party to the lawsuit." *Id.*

At the outset, the Third District cited authority from this Court and the First District Court of Appeal supporting the longstanding general principle of law that an allegation of mere friendship between a judge and a litigant or attorney appearing before the judge, standing alone, does not constitute a legally sufficient basis for disqualification. *Id.* at 409-10 (citing *MacKenzie v. Super Kids Bargain Store, Inc.*, 565 So. 2d 1332, 1338 (Fla. 1990); *Smith v. Santa Rosa Island Auth.*, 729 So. 2d 944, 946 (Fla. 1st DCA 1998)).

The Third District acknowledged that "this authority does not foreclose the possibility that a relationship between a judge and a lawyer may, under certain circumstances, warrant disqualification." *Id.* at 410. The Third District noted that

the Fourth District in *Domville* "held that recusal was required when a judge was a Facebook 'friend' with the prosecutor" based on "a 2009 Judicial Ethics Advisory Committee Opinion." *Id.* (citing Fla. JEAC Op. 2009-20 (Nov. 17, 2009)). The Florida Judicial Ethics Advisory Committee ("JEAC") advised in its 2009 opinion that judges were prohibited from adding lawyers who appear before them as "friends" on their Facebook pages or from allowing lawyers who appear before them to add them as "friends" on the lawyers' Facebook pages based on the JEAC's conclusion that "a judge's selection of Facebook 'friends' necessarily 'conveys or permits others to convey the impression that they are in a special position to influence the judge' " in violation of Canon 2B of the Florida Code of Judicial Conduct. *Id.* at 412 (quoting Fla. JEAC Op. 2009-20 (Nov. 17, 2009)). In support of its conclusion, the JEAC zeroed in on the "selection and communication process" of Facebook "friendship." *Id.* at 410 (quoting Fla. JEAC Op. 2009-20 (Nov. 17, 2009)). The JEAC reaffirmed its advice in 2010. *Id.* (citing Fla. JEAC Op. 2010-06 (Mar. 26, 2010)).

The Third District went on to explain that the Fifth District in *Chace v. Loisel*, 170 So. 3d 802 (Fla. 5th DCA 2014), subsequently "signaled disagreement" with *Domville*. *Herssein*, 229 So. 3d at 410. *Chace* expressed "serious reservations about the court's rationale in *Domville*" in part because "[a] Facebook

friendship does not necessarily signify the existence of a close relationship." *Id.* (quoting *Chace*, 170 So. 3d at 803-04).

The Third District agreed with *Chace* on this point for three reasons. *Id.* at 411. "First, as the Kentucky Supreme Court noted, 'some people have thousands of Facebook "friends." ' " *Id.* (quoting *Sluss v. Commonwealth*, 381 S.W.3d 215, 222 (Ky. 2012)). "Second, Facebook members often cannot recall every person they have accepted as 'friends' or who have accepted them as 'friends.' " *Id.* And "[t]hird, many Facebook 'friends' are selected based upon Facebook's data-mining technology [suggestions] rather than personal interactions." *Id.* Thus the Third District concluded that "a 'friend' on a social networking website is not necessarily a friend in the traditional sense of the word[—i.e., a person attached to another person by feelings of affection or personal regard]." *Id.* at 412. The Third District further concluded that "[a]n assumption that all Facebook 'friends' rise to the level of a close relationship that warrants disqualification simply does not reflect the current nature of this type of electronic social networking." *Id.*

The Third District ultimately "h[eld] that the mere fact that a judge is a Facebook 'friend' with a lawyer for a potential party or witness, without more, does not provide a basis for a well-grounded fear that the judge cannot be impartial or that the judge is under the influence of the Facebook 'friend.' " *Id.*

Accordingly, the Third District denied the petition for writ of prohibition. *Id.* The Third District acknowledged that its holding was "in conflict" with *Domville* but did not certify conflict. *Id.*

## ANALYSIS

The conflict issue presents a pure question of law that is subject to de novo review. *See Daniels v. State*, 121 So. 3d 409, 413 (Fla. 2013). In considering this question of law, we first discuss the general standard governing disqualification and review the case law addressing the specific issue of judicial disqualifications based on a friendship relationship. We then apply the established principles of law to the context of Facebook "friendships." Finally, we explain that our conclusion that Facebook "friendship," standing alone, is insufficient to warrant disqualification is consistent with the majority view in the other states.

### A. Legal Standard for Disqualification

"A motion to disqualify is governed substantively by section 38.10, Florida Statutes . . . and procedurally by Florida Rule of Judicial Administration 2.330." *Gregory v. State*, 118 So. 3d 770, 778 (Fla. 2013) (quoting *Gore v. State*, 964 So. 2d 1257, 1268 (Fla. 2007)). "The statute requires that the moving party file an affidavit in good faith 'stating fear that he or she will not receive a fair trial . . . on account of the prejudice of the judge' as well as 'the facts and the reasons for the belief that any such bias or prejudice exists.' " *Peterson v. State*,

221 So. 3d 571, 581 (Fla. 2017) (quoting § 38.10, Fla. Stat. (2014)). The rule provides that "[t]he judge against whom an initial motion to disqualify . . . is directed shall determine only the legal sufficiency of the motion and shall not pass on the truth of the facts alleged." *Pasha v. State*, 225 So. 3d 688, 703 (Fla. 2017) (quoting Fla. R. Jud. Admin. 2.330(f)). "The disqualification [statute and] rules are designed to keep the courts free from bias and prejudice." *Tableau Fine Art Group, Inc. v. Jacoboni*, 853 So. 2d 299, 301 (Fla. 2003). "[T]he disqualification statute and rules are [also] designed to ensure confidence in the judicial system, 'as well as to prevent the disqualification process from being abused for the purposes of judge-shopping, delay, or some other reason not related to providing for the fairness and impartiality of the proceeding.' " *Id.* (quoting *Livingston v. State*, 441 So. 2d 1083, 1086 (Fla. 1983)).

"The standard of review of a trial judge's determination on a motion to disqualify is de novo." *Parker v. State*, 3 So. 3d 974, 982 (Fla. 2009). "A motion to disqualify will be dismissed as legally insufficient if it fails to establish a well-grounded fear on the part of the movant that he will not receive a fair hearing." *Braddy v. State*, 111 So. 3d 810, 833 (Fla. 2012) (quoting *Correll v. State*, 698 So. 2d 522, 524 (Fla. 1997)). "Whether the motion is legally sufficient is a question of law." *Mansfield v. State*, 911 So. 2d 1160, 1170 (Fla. 2005). The standard for determining the legal sufficiency of a motion to disqualify is whether the facts

alleged, which must be assumed to be true, "would place a reasonably prudent person in fear of not receiving a fair and impartial trial." *MacKenzie*, 565 So. 2d at 1335 (quoting *Livingston*, 441 So. 2d at 1087). "A mere 'subjective fear[]' of bias [or prejudice] will not be legally sufficient; rather, the fear must be objectively reasonable." *Arbelaez v. State*, 898 So. 2d 25, 41 (Fla. 2005) (first alteration in original) (quoting *Fischer v. Knuck*, 497 So. 2d 240, 242 (Fla. 1986)).

## B.  Traditional "Friendship"

In the traditional sense, a "friend" is a person attached to another person by feelings of affection or esteem. *See, e.g.*, *Webster's Third New International Dictionary* 911 (1993 ed.) (defining the term "friend" as "one that seeks the society or welfare of another whom he holds in affection, respect, or esteem"); *The American Heritage Dictionary* 703 (5th ed. 2011) (defining the term "friend" as "[a] person whom one knows, likes, and trusts"); *Shorter Oxford English Dictionary* 1035 (6th ed. 2007) (defining the term "friend" as "[a] person joined by affection and intimacy to another").

But "friendship" in the traditional sense of the word does not necessarily signify a close relationship. It is commonly understood that friendship exists on a broad spectrum: some friendships are close and others are not. *See, e.g.*, *Black's Law Dictionary* 667 (6th ed. 1990) (defining the term "friend" as "[v]arying in degree from greatest intimacy to acquaintance more or less casual"); *Black's Law*

*Dictionary* 600 (5th ed. 1979) (same); *Black's Law Dictionary* 795 (4th ed. 1951) (same); *see also Clark v. Campbell*, 133 A. 166, 170 (N.H. 1926) ("Friendship is a word of broad and varied application."). Thus the mere existence of a friendship, in and of itself, does not inherently reveal the degree or intensity of the friendship.

It follows that the mere existence of a friendship between a judge and an attorney appearing before the judge, without more, does not reasonably convey to others the impression of an inherently close or intimate relationship. No reasonably prudent person would fear that she could not receive a fair and impartial trial based solely on the fact that a judge and an attorney appearing before the judge are friends of an indeterminate nature. It is for this reason that Florida courts—including this Court—have long recognized the general principle of law that an allegation of mere friendship between a judge and a litigant or attorney appearing before the judge, standing alone, does not constitute a legally sufficient basis for disqualification. *See, e.g.*, *MacKenzie*, 565 So. 2d at 1338 ("There are countless factors which may cause some members of the community to think that a judge would be biased in favor of a litigant or counsel for a litigant, e.g., friendship, member of the same church or religious congregation, neighbors, former classmates or fraternity brothers. However, such allegations have been found legally insufficient when asserted in a motion for disqualification."); *Ervin v. Collins*, 85 So. 2d 833, 833-34 (Fla. 1956) (allegations of friendship between three

supreme court justices and the governor, who was a party, were "not sufficient to constitute a legal basis for disqualification"); *Ball v. Yates*, 29 So. 2d 729, 735 (Fla. 1946) (allegation of friendship between a supreme court justice and an attorney previously employed by the prevailing party was "in fact and in law . . . inadequate and insufficient in substance" for disqualification); *see also Smith*, 729 So. 2d at 946; *Adkins v. Winkler*, 592 So. 2d 357, 360-61 (Fla. 1st DCA 1992); *Raybon v. Burnette*, 135 So. 2d 228, 230-31 (Fla. 2d DCA 1961).[2]

With this legal framework in mind, we now turn to address the Facebook "friendship" issue.

## C. Facebook "Friendship"

Facebook was officially "launched on February 4, 2004." *Facebook, Inc. v. DLA Piper LLP (US)*, 23 N.Y.S.3d 173, 175 (N.Y. App. Div. 2015). Facebook is a social media and social networking service with approximately "1.79 billion active users." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017). Facebook "permits registered users to do a host of things, among them: posting and reading comments, events, news, and, in general, communicating with . . . others." *United*

---

2. Of course, this general rule of law does not suggest that a friendship between a judge and an attorney of a determinate nature cannot constitute a close or intimate relationship that warrants disqualification. Nor does it foreclose the possibility that a friendship between a judge and an attorney of an indeterminate nature may, in conjunction with some additional factor, constitute legally sufficient grounds for disqualification.

- 10 -

*States v. Jordan*, 678 F. App'x 759, 761 n.1 (10th Cir. 2017); *see, e.g.*, *Elonis v. United States*, 135 S. Ct. 2001, 2004-07 (2015).

> Facebook provides users with several means of communicating with one another. Users can send private messages to one or more users. Users can also communicate by posting information to their Facebook "wall," which is part of each user's Profile Page. A Facebook "wall post" can include written comments, photographs, digital images, videos, and content from other websites.

*Shaw v. Young*, 199 So. 3d 1180, 1188 n.6 (La. Ct. App. 2016) (quoting *Ehling v. Monmouth-Ocean Hosp. Serv. Corp.*, 961 F. Supp. 2d 659, 662 (D.N.J. 2013)).

"Facebook users [primarily] create online profiles to share information about themselves with other Facebook users." *Sublet v. State*, 113 A.3d 695, 698 n.5 (Md. 2015). "To create a profile, a person must go to www.facebook.com, enter his or her full name, birth date, and e-mail address, and register a password. Facebook then sends a confirmation link to the registered e-mail, which the person must click on to complete registration." *Smith v. State*, 136 So. 3d 424, 432 (Miss. 2014). "Thereafter, the profile may be accessed on any computer or mobile device by logging into Facebook's website using the same e-mail address and password combination." *State v. Buhl*, 138 A.3d 868, 874 n.2 (Conn. 2016). "Once registered, a Facebook user can . . . customize her profile by adding personal information, photographs, or other content. A user can [also] establish connections with other Facebook users by 'friending' them; the connected users are thus called 'friends.' " *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1063 (9th Cir.

- 11 -

2016); *see Ehling*, 961 F. Supp. 2d at 662 ("A Facebook user can connect with other users by adding them as 'Facebook friends.' ").

A Facebook user's "friend" list appears on his profile page. *See Strunk v. State*, 44 N.E.3d 1, 5 (Ind. Ct. App. 2015); *Commonwealth v. K.S.F.*, No. 2497 EDA 2011, 2013 WL 11266159, at *1 n.3 (Pa. Super. Ct. Apr. 12, 2013). In order to "select" a Facebook "friend," a user must either (1) send a Facebook "friend" request to another user to accept or (2) accept a Facebook "friend" request sent by another user; a Facebook "friendship" is officially established by the acceptance of a previously sent "friend" request. *See* Fla. JEAC Op. 2009-20 (Nov. 17, 2009).

In general, "Facebook users may opt to make all or part of their Facebook information private . . . ." *Sluss*, 381 S.W.3d at 227 n.12. But even if a Facebook user generally opts to make the user's profile private, others may still be able to view the user's list of Facebook "friends" on the user's profile page. *See Chaney v. Fayette County Pub. Sch. Dist.*, 977 F. Supp. 2d 1308, 1315 (N.D. Ga. 2013); *State v. Eleck*, 23 A.3d 818, 820 n.1 (Conn. App. Ct. 2011). Moreover, even if the Facebook user specifically opts to make the user's Facebook "friend" list private, the user may still appear as a Facebook "friend" on another's profile page. *See United States v. Meregildo*, 883 F. Supp. 2d 523, 525-26 (S.D.N.Y. 2012); *State v. Gaps*, 316 P.3d 172, 2014 WL 113465, at *2 (Kan. Ct. App. 2014). In this way, it could be said that a Facebook user publicly "communicates" the existence of the

user's Facebook "friendships" to others. *See* Fla. JEAC Op. 2009-20 (Nov. 17, 2009).

We now come to the crux of the matter: what is the nature of Facebook "friendship?" "The word 'friend' on Facebook is a term of art." *Chace*, 170 So. 3d at 803. In its most basic sense, a Facebook "friend" is a person digitally connected to another person by virtue of their Facebook "friendship." *See, e.g.*, *Power Ventures*, 844 F.3d at 1063; *Ehling*, 961 F. Supp. 2d at 662.

A Facebook "friend" may or may not be a "friend" in the traditional sense of the word. But Facebook "friendship" is not—as a categorical matter—the functional equivalent of traditional "friendship." The establishment of a Facebook "friendship" does not objectively signal the existence of the affection and esteem involved in a traditional "friendship." Today it is commonly understood that Facebook "friendship" exists on an even broader spectrum than traditional "friendship." Traditional "friendship" varies in degree from greatest intimacy to casual acquaintance; Facebook "friendship" varies in degree from greatest intimacy to "virtual stranger" or "complete stranger." *Chace*, 170 So. 3d at 803; *see, e.g.*, *United States v. Tsarnaev*, 157 F. Supp. 3d 57, 67 n.16 (D. Mass. 2016) ("Over a billion people use Facebook and connect with other users as 'friends.' Some may be friends in the traditional sense, but others are no more than acquaintances or contacts or in some cases may even be complete strangers."); *In*

*re Air Crash Near Clarence Ctr., N.Y.*, No. 09-CV-769S, 2013 WL 6073635, at *5 (W.D.N.Y. Nov. 18, 2013) (noting that "one can be [Facebook] 'friends' with people known to them, with strangers, with celebrities, with animals, and even with inanimate objects").

So it is regularly the case that Facebook "friendships" are more casual and less permanent than traditional friendships. *See, e.g.*, *Williams v. Scribd, Inc.*, No. 09CV1836-LAB WMC, 2010 WL 10090006, at *6 (S.D. Cal. June 23, 2010) ("[It is] no secret that the 'friend' label means less in cyberspace than it does in the neighborhood, or in the workplace, or on the schoolyard, or anywhere else that humans interact as real people."); *Quigley Corp. v. Karkus*, No. 09-1725, 2009 WL 1383280, at *5 n.3 (E.D. Pa. May 15, 2009) ("Indeed, 'friendships' on Facebook may be as fleeting as the flick of a delete button."); *Herssein*, 229 So. 3d at 411 (" '[S]ome people have thousands of Facebook "friends." ' . . . Facebook members often cannot recall every person they have accepted as 'friends' or who have accepted them as 'friends.' . . . [M]any Facebook 'friends' are selected based upon Facebook's data-mining technology [suggestions] rather than personal interactions." (quoting *Sluss*, 381 S.W.3d at 222)); *State v. Smith*, No. M2014-00059-CCA-R3-CD, 2015 WL 100452, at *8 (Tenn. Crim. App. Jan. 7, 2015) ("Facebook 'friendships' frequently exist between those who are indifferent to one another.").

It is therefore undeniable that the mere existence of a Facebook "friendship," in and of itself, does not inherently reveal the degree or intensity of the relationship between the Facebook "friends." Since the creation of a Facebook "friendship" in itself does not signal the existence of a traditional "friendship," it certainly cannot signal the existence of a close or intimate relationship. *See McGaha v. Commonwealth*, 414 S.W.3d 1, 6 (Ky. 2013) ("It is now common knowledge that merely being friends on Facebook does not, *per se*, establish a close relationship . . . ."); *Sluss*, 381 S.W.3d at 222 (" '[F]riendships' on Facebook and other similar social networking websites do not necessarily carry the same weight as true friendships or relationships in the community . . . ."); *Kirby v. Wash. State Dep't of Emp't Sec.*, No. 70738-8-I, 2014 WL 7339610, at *1 (Wash. Ct. App. Dec. 22, 2014) ("The words 'post,' 'friend,' and 'friending' used in [the Facebook] context merely refer to individuals communicating with those listed on a social networking website and do[] not, necessarily, imply any more significant relationship between those individuals.").

In short, the mere fact that a Facebook "friendship" exists provides no significant information about the nature of any relationship between the Facebook "friends." Therefore, the mere existence of a Facebook "friendship" between a judge and an attorney appearing before the judge, without more, does not reasonably convey to others the impression of an inherently close or intimate

- 15 -

relationship. No reasonably prudent person would fear that she could not receive a fair and impartial trial based solely on the fact that a judge and an attorney appearing before the judge are Facebook "friends" with a relationship of an indeterminate nature.

As we now explain, our holding is in line with the majority of state judicial discipline bodies and judicial ethics advisory committees—which we refer to collectively as state ethics committees—that have considered whether Facebook "friendship" between a judge and an attorney appearing before the judge creates the appearance of impropriety under their respective states' judicial codes of conduct.

### D. State Ethics Committees

The clear majority position is that mere Facebook "friendship" between a judge and an attorney appearing before the judge, without more, does not create the appearance of impropriety under the applicable code of judicial conduct. *See, e.g.*, Ariz. JEAC Op. 14-01, at 4 (Aug. 5, 2014); Ky. Jud. Ethics Comm. Op. JE-119, at 2-3 (Jan. 20, 2010); Md. Jud. Ethics Comm. Op. 2012-07, at 5 (June 12, 2012); Mo. Ret., Removal, & Discipline Comm'n Op. 186, at 1 (Apr. 24, 2015); N.M. Jud. Conduct Adv. Comm. Op. Concerning Soc. Media, at 13-14 (Feb. 15, 2016); N.Y. JEAC Op. 13-39 (May 28, 2013); Ohio Bd. of Comm'rs on Grievances & Discipline Op. 2010-7, at 1-2, 8-9 (Dec. 3, 2010); Utah JEAC Op. 12-01, at 4-7

(Aug. 31, 2012). In other words, the majority position is that the mere existence of a Facebook "friendship" between a judge and an attorney appearing before the judge, without more, does not reasonably convey or permit others to convey the impression that they are in a special position to influence the judge in violation of the applicable code of judicial conduct.

The minority position is that Facebook "friendship" between a judge and an attorney appearing before the judge, standing alone, creates the appearance of impropriety because it reasonably conveys or permits others to convey the impression that they are in a special position to influence the judge in violation of the applicable code of judicial conduct. *See, e.g.*, Cal. Judges Ass'n Jud. Ethics Comm. Op. 66, at 1, 10-11 (Nov. 23, 2010); Conn. Jud. Ethics Comm. Op. 2013-06 (Mar. 22, 2013); Fla. JEAC Op. 2009-20 (Nov. 17, 2009); Mass. Jud. Ethics Comm. Op. 2011-6 (Dec. 28, 2011); Okla. Jud. Ethics Adv. Pan. 2011-3 (July 6, 2011).

Florida's JEAC was one of the first to advise that judges were prohibited from adding attorneys who appear before them as "friends" on their Facebook page or from allowing attorneys who appear before them to add them as "friends" on the attorneys' Facebook pages based on the JEAC's conclusion that a judge's selection of Facebook "friends" necessarily "conveys or permits others to convey the impression that they are in a special position to influence the judge" in violation of

- 17 -

Canon 2B of the Florida Code of Judicial Conduct. Fla. JEAC Op. 2009-20 (Nov. 17, 2009).[3] The JEAC has since reaffirmed its support of the minority position and extended the reasoning of the minority position to other social media and social networking services including LinkedIn and Twitter. *See* Fla. JEAC Op. 2013-14 (July 30, 2013) (extending the reasoning of the minority position to Twitter); Fla. JEAC Op. 2012-12 (May 9, 2012) (extending the reasoning of the minority position to LinkedIn); Fla. JEAC Op. 2010-06 (Mar. 26, 2010) (reaffirming its support of the minority position).

The overarching concern of the JEAC is that a reasonably prudent person would fear that he or she could not receive a fair and impartial trial based solely on the fact that a judge and an attorney appearing before the judge are Facebook "friends" of an indeterminate nature. For the reasons we have explained, we conclude that concern is unwarranted. The correct approach is that taken by the majority position, which recognizes the reality that Facebook "friendship," standing alone, does not reasonably convey to others the impression of an inherently close or intimate relationship that might warrant disqualification.

---

3. Canon 2B of the Florida Code of Judicial Conduct provides that a judge shall not "convey or permit others to convey the impression that they are in a special position to influence the judge."

In its 2009 Opinion, the JEAC relied on the "selection and communication process" of Facebook "friendship" in support of its conclusion that Facebook "friendship" between a judge and an attorney appearing before the judge reasonably "convey[s] or permit[s] others to convey the impression that they are in a special position to influence the judge." Fla. JEAC Op. 2009-20 (Nov. 17, 2009) (quoting Fla. Code Jud. Conduct, Canon 2B)). But by focusing on the public nature of Facebook "friendship," the JEAC missed the intrinsic nature of Facebook "friendship." It is commonly understood that traditional "friendship" involves a "selection and communication process," albeit one less formalized than the Facebook process. People traditionally "select" their friends by choosing to associate with them to the exclusion of others. And people traditionally "communicate" the existence of their friendships by choosing to spend time with their friends in public, introducing their friends to others, or interacting with them in other ways that have a public dimension. Nevertheless, this Court has consistently recognized that an allegation of mere friendship between a judge and a litigant or attorney appearing before the judge, standing alone, does not constitute a legally sufficient basis for disqualification. *See, e.g.*, *MacKenzie*, 565 So. 2d at 1338; *Ervin*, 85 So. at 833-34; *Ball*, 29 So. 2d at 735. If traditional "friendship," without more, does not reasonably convey or permit others to convey the impression that they are in a special position to influence the judge, then surely

- 19 -

Facebook "friendship"—which exists on an even broader spectrum than traditional "friendship" and is regularly more casual and less permanent than traditional "friendship"—does not reasonably convey such an impression. The JEAC's position simply cannot be reconciled with this Court's longstanding treatment of disqualification motions based on mere allegations of traditional "friendship."

## CONCLUSION

In some circumstances, the relationship between a judge and a litigant, lawyer, or other person involved in a case will be a basis for disqualification of the judge. Particular friendship relationships may present such circumstances requiring disqualification. But our case law clearly establishes that not every relationship characterized as a friendship provides a basis for disqualification. And there is no reason that Facebook "friendships"—which regularly involve strangers—should be singled out and subjected to a per se rule of disqualification.

We approve *Herssein* and disapprove *Domville*.

It is so ordered.

POLSTON, LABARGA, and LAWSON, JJ., concur.
LABARGA, J., concurs with an opinion.
PARIENTE, J., dissents with an opinion, in which LEWIS and QUINCE, JJ., concur.

ANY MOTION FOR REHEARING OR CLARIFICATION MUST BE FILED WITHIN SEVEN DAYS. A RESPONSE TO THE MOTION FOR REHEARING/CLARIFICATION MAY BE FILED WITHIN FIVE DAYS AFTER THE FILING OF THE MOTION FOR REHEARING/CLARIFICATION.

NOT FINAL UNTIL THIS TIME PERIOD EXPIRES TO FILE A REHEARING/CLARIFICATION MOTION AND, IF FILED, DETERMINED.

LABARGA, J., concurring.

I concur with the majority opinion. However, I write to strongly urge judges not to participate in Facebook. For newly elected or appointed judges who have existing Facebook accounts, I encourage deactivation of those accounts.[4] As explained by the majority, "friendship" on Facebook, without more, does not create a legally sufficient basis for disqualification. Rather, the unique facts and circumstances of each case, in addition to the base fact of "friendship," are what will determine whether disqualification is required.

Nevertheless, as noted by the dissent, participation in Facebook by members of the judiciary "is fraught with risk that could undermine confidence in the judge's ability to be a neutral arbiter." Dissenting op. at 24. This is deeply concerning because judges are to decide cases solely upon the facts presented to them and the law. The public and the parties expect nothing less. Therefore, judges must avoid situations that could suggest or imply that a ruling is based upon

---

4. When a person assumes the significant responsibility of serving as a member of the judiciary, they must "accept restrictions on [their] conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly." Fla. Code Jud. Conduct, Canon 2A cmt. The dissent is absolutely correct that "public trust in the impartiality and fairness of the judicial system is of the utmost importance." Dissenting op. at 31.

anything else.  Facebook "friendships" fall across a broad spectrum, from virtual stranger to close, personal friend.  Because the relationships between judges and attorneys can fall anywhere on that spectrum, judges who elect to maintain Facebook "friendships" with attorneys who have any potential to appear before them are, quite simply, inviting problems.  The Honorable Catherine Shaffer, a superior court judge in Washington State and current president of the American Judges Association, aptly states that while judges must decide for themselves whether to participate in social media "with a careful eye to the ethical requirements of their own jurisdiction," she "steer[s] clear" of it because "misperception is all too easy."  *Are Facebook Friends Really Friends?* National Center for State Courts (Aug. 29, 2018), available at https://content.govdelivery.com/accounts/USNCSC/bulletins/209842b.[5]

I recognize that in this day and age, Facebook may be the primary means some judges use to stay in touch with family members, actual friends, or people with whom they have reconnected after many years.  If this is the case, then at the very least, judges should carefully review their Facebook accounts and limit their

---

5. Judge Shaffer also expressed the belief that "it is extraordinarily difficult to prevent improper ex parte contacts."  *Are Facebook Friends Really Friends?* National Center for State Courts (Aug. 29, 2018), available at https://content.govdelivery.com/accounts/USNCSC/bulletins/209842b.

"friendships" to cover only such individuals.  However, I agree with Judge Shaffer

that the safest course of action is to not participate in Facebook at all.

PARIENTE, J., dissenting.

I dissent.  I would adopt the view of the Fourth District Court of Appeal in

*Domville v. State*, 103 So. 3d 184 (Fla. 4th DCA 2012), that having a lawyer as a

Facebook "friend" not only "may undermine confidence in the judge's neutrality"

but in this case warranted the judge's recusal based on a "well-founded fear of not

receiving a fair and impartial trial." *Id.* at 186.  Even more pointedly, as Judge

Gross explained in his concurring specially opinion in granting the motion for

certification in *Domville*:[6]

> Judges do not have the unfettered social freedom of teenagers.
> Central to the public's confidence in the courts is the belief that fair
> decisions are rendered by an impartial tribunal.  Maintenance of the
> appearance of impartiality requires the avoidance of entanglements
> and relationships that compromise that appearance.  *Unlike face to
> face social interaction, an electronic blip on a social media site can
> become eternal in the electronic ether of the internet.  Posts on a
> Facebook page might be of a type that a judge should not consider in*

---

6. Following its opinion in *Domville*, the Fourth District certified the
following question of great public importance:

> Where the presiding judge in a criminal case has accepted the
> prosecutor assigned to the case as a Facebook "friend," would a
> reasonably prudent person fear that he could not get a fair and
> impartial trial, so that the defendant's motion for disqualification
> should be granted?

*Domville v. State*, 125 So. 3d 178, 179 (Fla. 4th DCA 2013).  However, this Court
declined review.  *State v. Domville*, 110 So. 3d 441 (Fla. 2013).

- 23 -

> *a given case. The existence of a judge's Facebook page might exert pressure on lawyers or litigants to take direct or indirect action to curry favor with the judge.* As we recognized in the panel opinion, a person who accepts the responsibility of being a judge must also accept limitations on personal freedom.

*Domville*, 125 So. 3d at 179 (emphasis supplied) (Gross, J., concurring specially). I wholeheartedly agree.

While Facebook and other social media sites have become more sophisticated, recent history has shown that a judge's involvement with social media is fraught with risk that could undermine confidence in the judge's ability to be a neutral arbiter. For these reasons, I would adopt a strict rule requiring judges to recuse themselves whenever an attorney with whom they are Facebook "friends" appears before them. This rule does little to limit the judge's personal liberty, while advancing the integrity of the judicial branch as the one branch of government that is above politics.

Regardless of the appropriate parameters for a future amendment to the Code of Judicial Conduct relating to use of Facebook and other social media, it is clear that the judge in this case should have recused herself because, at the time of the recusal motion, the only binding opinion was the Fourth District's in *Domville*. *Domville* expressly required judges to recuse themselves from cases where they were Facebook friends with the lawyer, 103 So. 3d at 185, and the trial judge was

required to follow that opinion.  *See Pardo v. State*, 596 So. 2d 665, 666 (Fla. 1992).

More importantly and most respectfully, in my view, any attempt to equate Facebook "friendship" with traditional friendship ultimately fails.  The fact that both are called "friendship" does not mean they are comparable or can be evaluated in the same manner.  Further, obtaining the information required to establish a good faith basis to file a motion for recusal would require discovery that is both impractical and potentially invasive of both the judge's and attorney's privacy.

The premise of the majority opinion is that Facebook friendships and traditional friendships are analogous.  But, equating friendships in the real world with friendships in cyberspace is a false equivalency.  The existence of a Facebook "friendship" may reveal far more information regarding the intimacy and the closeness of the relationship than the majority would assign it.  For example, as the majority explains, once a person becomes "friends" with another Facebook user, that person gains access to all of the personal information on the user's profile page—including photographs, status updates, likes, dislikes, work information, school history, digital images, videos, content from other websites, and a host of other information—even when the user opts to make all of his or her information private to the general public.  Majority op. at 10-12; *see also* Daniel Smith, *When*

*Everyone is the Judge's Pal: Facebook Friendship and the Appearance of Impropriety Standard*, 3 Case W. Res. J. L. Tech. & Internet 183, 200-06 (2011). Additionally, the ease of access to the "friend's" information allows Facebook "friends" to be privy to considerably more information, including potentially personal information, on an almost daily basis.

Social media communication is quickly replacing other modes of casual communication. *See* Smith, *supra*, at 200-06. Moreover, information conveyed on social media can range from the frivolous—gossip and what someone ate for dinner—to the meaningful—updates on family, friends, or even world events.

> Facebook also gives the public a new way to scrutinize public figures. Politicians, for instance, have become painfully aware of the downsides of maintaining an Internet persona. Numerous candidates have been forced to deal with unbecoming photographs coming to the public's attention through either their own Facebook use or postings by other users. One candidate even found himself apologizing for his college-aged son's unremarkable underage drinking.

*Id.* at 188-89 (footnotes omitted).

Instead of attempting to compare social media communication and friendship to traditional communication and friendship when determining the appropriate social media policy for the judiciary, this Court should consider the elusive and public nature of Facebook "friendship," as both the Fourth District and the Florida Judicial Ethics Advisory Committee (JEAC) did. *See Domville*, 103 So. 3d at 185-86; Fla. JEAC Op. 2010-06 (Mar. 26, 2010); Fla. JEAC Op. 2009–20

(Nov. 17, 2009). As those opinions correctly concluded, when those differences are taken into account, it is clear that judges' Facebook "friendships" with attorneys who appear in their courtrooms can easily cause an appearance of impropriety.

Florida's Code of Judicial Conduct requires that judges "avoid impropriety and the appearance of impropriety in all of the judge's activities." Fla. Code of Jud. Con. Canon 2. Additionally, Canon 2B states: "A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others; *nor shall a judge convey or permit others to convey the impression that they are in a special position to influence the judge*." Fla. Code Jud. Conduct, Canon 2B (emphasis supplied). The commentary to Canon 2A explains:

> A judge must expect to be the subject of constant public scrutiny. A judge must therefore accept restrictions on the judge's conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly.

As the JEAC concluded:

> The Committee notes, in coming to this conclusion, that social networking sites are broadly available for viewing on the internet. Thus, it is clear that many persons viewing the site will not be judges and will not be familiar with the Code, its recusal provisions, and other requirements which seek to assure the judge's impartiality. However, the test for Canon 2B is not whether the judge intends to convey the impression that another person is in a position to influence the judge, but rather whether the message conveyed to others, as viewed by the recipient, conveys the impression that someone is in a special position to influence the judge. Viewed in this way, the Committee concludes that identifying lawyers who may

- 27 -

appear before a judge as "friends" on a social networking site, if that relationship is disclosed to anyone other than the judge by virtue of the information being available for viewing on the internet, violates Canon 2(B).

Fla. JEAC Op. 2009-20 (Nov. 17, 2009).

This dissent should not be viewed as an attack on the responsible use of social media. I emphasize, as did the JEAC, that the selection and rejection function is what causes the potential for the appearance of impropriety, after the judge has established the social networking profile that affords the judge the ability to accept or reject "friends." As the JEAC explained,

> With regard to a social networking site, in order to fall within the prohibition of Canon 2B, the Committee believes that three elements must be present. First, the judge must establish the social networking page. Second, the site must afford the judge the right to accept or reject contacts or "friends" on the judge's page, or denominate the judge as a "friend" on another member's page. Third, the identity of the "friends" or contacts selected by the judge, and the judge's having denominated himself or herself as a "friend" on another's page, must then be communicated to others. Typically, this third element is fulfilled because each of a judge's "friends" may see on the judge's page who the judge's other "friends" are. Similarly, all "friends" of another user may see that the judge is also a "friend" of that user. It is this selection and communication process, the Committee believes, that violates Canon 2B, because the judge, by so doing, conveys or permits others to convey the impression that they are in a special position to influence the judge.

*Id.*

Clearly, social media plays an important role in today's society. For example, this Court and The Florida Bar as well as many other groups have public

Facebook pages that are useful to disseminate information and enhance the role of judges, lawyers, and the judiciary in the public domain. Significantly, individuals may only "follow" these pages, but cannot become Facebook "friends" with either organization. This allows the general public to be privy to any and all information posted on the page without the appearance of impropriety that accompanies self-selection. Judges could, likewise, create pages that follow this model.[7]

As a practical matter, it is unrealistic to require discovery into the extent of social media "friendship" as a prerequisite to recusal before a valid motion may be filed. An individual judge's social media, whether it is Facebook, LinkedIn, Instagram, or any other site, is fraught with concerns for the average litigant because it is difficult and intrusive for a litigant to determine with whom the judge has connected, with whom the judge has declined to connect, and what type of communication the judge engages in on these platforms.

---

7. "Following" does not involve or require acceptance by the person; it only allows you to see what that person decides to post on his or her public "Wall." If you choose to follow someone, that person's public posts will be automatically delivered to your daily feed. Conversely the person being followed will not see what the followers post (unless he or she follows them back), and the followers will not be able to access anything else that the person keeps on his or her private page. *See Follow*, Facebook Help Ctr., https://www.facebook.com/help/382751108453953/?ref=u2u (last visited Aug. 30, 2018).

If the Court is declining to follow the JEAC advisory opinions, then I urge that it at least adopt parameters for judges to follow when engaging with social media, similar to those adopted in California.[8] And even if the majority does allow judges to continue to use social media, then it should institute a rule similar to that

---

8. The California Judicial Ethics Committee considers the following factors in determining whether the attorney is in a special position to influence the judge and cast doubt on the judge's ability to be impartial:

1) The nature of the social networking site
The more personal the nature of the page, the greater the likelihood that including an attorney would create the appearance that the judge would be in a special position to influence the judge, or cast doubt on the judge's ability to act impartially.

2) The number of "friends" on the page
The greater the number of "friends" on the judge's page the less likely it is one could reasonably perceive that any individual participant is in a position to influence the judge.

3) The judge's practice in determining whom to include
As with the number of people on the page, the more inclusive the page the less likely it is to create the impression that any individual member is in a special position to influence the judge.

4) How regularly the attorney appears before the judge
If the likelihood that the attorney will actually appear before the judge is low, the more likely it is that the interaction would be permissible. On the other hand, if the attorney appears frequently before the judge the interaction is less likely to be permissible.

*See* Cal. Jud. Ethics Comm. Op. 66, at 8 (Nov. 23, 2010).

espoused by Connecticut, which concluded that when new judicial officials wish to return to electronic social media following investiture, the judicial official must

> terminate permanently the existing account and start anew. If this course of action cannot be accomplished, the Judicial Official should edit his/her profile page upon reactivation to ensure that it is in compliance with the conditions of this opinion in every respect. This includes, but is not limited to, removing inappropriate contacts, photos, links, comments, petitions, "friending," and "Check In" postings. A Judicial Official should monitor closely new developments with respect to the [electronic social media] and keep abreast of applications instituted by the site managers. The Judicial Official also should monitor his/her participation with respect to maintaining appropriate dignity as well as insuring the precedence of the judicial office.

*See* Conn. Jud. Ethics Comm. Op. 2013-06 (Mar. 22, 2013).

Judges in Florida are non-partisan and held to the strictest compliance with the Code of Judicial Conduct to avoid even the appearance of impropriety. Judges, unlike the general public and even other elected officials, accept the responsibility when they take the oath of office and don their black robes that many prior activities may have to be limited for the purpose of maintaining the integrity of our justice system. One of these activities should include the use of social media to communicate, either actively or passively, with attorneys who appear before them. Because public trust in the impartiality and fairness of the judicial system is of the utmost importance, this Court should err on the side of caution.

**CONCLUSION**

The bottom line is that because of their indeterminate nature and the real possibility of impropriety, social media friendships between judges and lawyers who appear in the judge's courtroom should not be permitted. Under this rule, the opposing litigant would not be required to delve into how close the Facebook friendship may be, the judge avoids any appearance of impropriety, and Florida's courts are spared from any unnecessary questions regarding the integrity of our judiciary. Regardless, in this case, the judge was required to recuse herself because of binding precedent. Thus, I would quash the Third District Court of Appeal's decision in *Law Offices of Herssein & Herssein, P.A. v. United Services Automobile Ass'n*, 229 So. 3d 408 (Fla. 3d DCA 2017), and approve the Fourth District's decision in *Domville*.

Accordingly, I dissent.

LEWIS and QUINCE, JJ., concur.

Application for Review of the Decision of the District Court of Appeal – Direct Conflict of Decisions

Third District - Case No. 3D17-1421

(Miami-Dade County)

Reuven T. Herssein of Herssein Law Group, North Miami, Florida; and Maury L. Udell of Beighley, Myrick, Udell & Lynne, P.A., Miami, Florida,

for Petitioners

Suzanne Youmans Labrit, Frank A. Zacherl, and Amy M. Wessel of Shutts & Bowen, LLP, Tampa, Florida,

for Respondent

Christina Paylan, St. Pete Beach, Florida,

for Amicus Curiae Christina Paylan, M.D.